**UNITED STATES of America**

v.

**Arthur D. SEALE,**

**Arthur Seale, Appellant No. 92–5686.**

**UNITED STATES of America**

v.

**Irene J. SEALE,**

**Irene Jacqueline Seale, Appellant No. 93–5069.**

**Nos. 92–5686, 93–5069.**

United States Court of Appeals, Third Circuit.

Argued Sept. 23, 1993.

Decided April 7, 1994.

Chester M. Keller (argued), Office of Federal Public Defender, Newark, NJ, for appellant Arthur Seale.

Sallyanne Floria (argued), Floria & Callori, Verona, NJ, for appellant Irene Jacqueline Seale.

Michael Chertoff (argued), Edna B. Axelrod, R. David Walk, Jr., Office of the U.S. Atty., Newark, NJ, for appellee.

Before: STAPLETON, ROTH and LEWIS, Circuit Judges.

## OPINION OF THE COURT

LEWIS, Circuit Judge.

This appeal arises from the highly publicized kidnapping and death of Exxon Company International executive Sidney J. Reso in 1992. Appellants Arthur and Irene Seale, husband and wife, were convicted of various charges in connection with the kidnapping, sentenced to lengthy prison terms and ordered to pay fines of $1.75 million and $500,000 respectively. Because we conclude that the district court should not have departed to impose the fines it did, we will vacate its imposition of the fines.

## I.

In late 1991, Arthur Seale, a former security officer for Exxon Corporation,[1] conceived a plan to kidnap an Exxon executive. His goal was to obtain a large sum of money to assist with his and his wife's financial problems. He selected Sidney J. Reso, president of an Exxon subsidiary, as the target of an elaborate scheme in which Mrs. Seale agreed to participate.

For the next three months, the Seales prepared to carry out their crime. They conducted surveillance at Reso's home to ascertain the time he usually left for work and the method of transportation he usually used. They constructed a coffin-like box in which to place Reso once they had abducted him. Arthur Seale began conducting research on how to avoid paying taxes on the ransom he expected to receive and on environmental causes he might use as a ploy to explain the kidnapping in ransom notes.

On the morning of April 29, 1992, Mr. and Mrs. Seale abducted Reso as he left for work. During a struggle at the foot of his driveway as the Seales sought to place him in their van, Reso was shot. He died four days later. For the next six weeks, however, Arthur and Irene Seale, holding themselves out as an environmental group named the "Fernando Pereira Brigade, Warriors of the Rainbow," pursued their efforts to obtain $18.5 million in ransom by leading Federal Bureau of Investigation officials, the Reso family, other Exxon employees and the general public to believe that Reso was still alive but would be "eliminated" if their instructions were not followed.

On June 19, 1992, before any ransom money was paid, Arthur and Irene Seale were arrested and charged with federal and state kidnapping and extortion charges. Irene Seale soon began to cooperate with authorities. She led them to Reso's grave and described the scheme to them. Pursuant to a plea agreement, she pleaded guilty to one count of extortion and one count of conspiracy to extort, each in violation of 18 U.S.C. § 1951. Arthur Seale did not enter into a plea agreement with the government; instead, he pleaded guilty to a seven-count

1. Exxon Corporation is the parent company of Exxon Company International. Both will be referred to as "Exxon" in the remainder of this opinion.

indictment two days before his trial was to start.[2]

Both Seales received stiff sentences. Mr. Seale was sentenced to 95 years in prison and a five-year term of supervised release, and ordered to pay a $1.75 million fine and $350 in special assessments. Mrs. Seale was sentenced to 20 years in prison and a five-year term of supervised release, and ordered to pay a $500,000 fine and $100 in special assessments. Both Seales have also pleaded guilty to and received sentences for state charges arising from their criminal activity.

As applicable to the Seales, United States Sentencing Guidelines ("Guidelines") § 5E1.2(c) establishes a fine range of $25,000 to $250,000, whereas 18 U.S.C. § 3571 allows a maximum fine of $250,000 for each felony count. Applying the statutory maximum to each count, the court departed from the appellants' Guidelines ranges and arrived at the maximum cumulative figure for each of them—$1,750,000 and $500,000, respectively. Thus, Mr. Seale's fine represented a sevenfold increase in his Guidelines maximum, whereas Mrs. Seale's fine represented a doubling of that same amount.

## II.

On appeal, Mr. and Mrs. Seale challenge the fines they were ordered to pay.[3] The district court had jurisdiction over this case under 18 U.S.C. § 3231, and we exercise jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

The issues we must address are numerous and require consideration under varying standards of review.

## A.

Neither Mr. nor Mrs. Seale are presently able to pay any fine. They each have a negative net worth, and their only income at the time their presentence reports were prepared was a $1,400 monthly pension Mr. Seale received from the Hillside, New Jersey police department, where he once served as an officer.[4] In addition to other judgments and claims against them, the Reso family has also filed a civil wrongful death lawsuit against the Seales; at the time of sentencing Mrs. Seale had defaulted and was merely awaiting entry of a judgment against her in that case.[5] As a result of their crime, however, the Seales may stand to earn a considerable sum by selling their stories.

It can hardly be disputed that the American public is intrigued by accounts of sensational crimes, particularly those involving some unusual plot or twist, whether related through books, magazines, movies or television. One glance through some of the more recent television listings and bestseller lists reveals the public's almost obsessive interest in stories involving charges of bizarre criminal acts, such as the Amy Fisher case, the prosecution of the Menendez brothers, the Lorena Bobbitt trial and, most recently, the attack on figure skater Nancy Kerrigan. Nor is this a new phenomenon; books such as *In Cold Blood, Helter Skelter, Mafia Princess* and the unending volumes focussing on the assassination of President Kennedy,

2. Arthur Seale pleaded guilty to extortion and conspiracy to extort in violation of 18 U.S.C. § 1951; use of a firearm during a crime of violence in violation of 18 U.S.C. § 924(c); use of the mails with the intent to extort in violation of 18 U.S.C. § 876; use of the telephone with the intent to extort in violation of 18 U.S.C. §§ 875(a), (b); and two counts of travel with the intent to extort in violation of 18 U.S.C. § 1952.

3. Mr. Seale also claims that the district court erred by enhancing his offense level for use of a special skill; ruling that his offense level could have been increased by two because he was an "organizer, leader or manager"; refusing to decrease his offense level by two points for acceptance of responsibility; sentencing him to the

statutory maximum of 95 years without parole; ordering him to pay costs of imprisonment and supervised release in contravention of *United States v. Spiropoulos*, 976 F.2d 155 (3d Cir.1992); and failing to take into consideration that he would be sentenced in state court later that same day, thus double-counting his criminal conduct when fashioning his sentence. We have reviewed these issues and find them to be without merit.

4. According to the Seales, this pension would be terminated as a result of Mr. Seale's conviction.

5. We have not been apprised of the status of that case as asserted against Mr. Seale.

to name but a few, have stimulated readers' interest in crimes and criminals for decades. The consumers' appetite for such accounts seems commensurate with the lurid nature of the details of the criminal acts described. Obviously, there is money to be made in capitalizing upon criminal activity. This is especially true of the type of criminal activity the Seales engaged in; cruel and despicable as it was, it would likely intrigue many consumers.

Arthur Seale was certainly aware of this potential. At the time of his sentencing, he had already authorized an attorney "to negotiate the [sale of the] rights to his story to interested publishers or other media enterprises." Presentence report at ¶ 231. Mr. Seale had not entered into a formal agreement concerning the sale of his story, but he had advised the probation office "that it was his intention to sell the rights to his version of the offense." He had also represented that he would not partake in the profits from such a sale; instead, the proceeds would be used to pay the expenses of his state court attorney, offered as restitution to the Reso family and placed in trust for the support of his children. *Id.* There is little doubt that the media might be interested in his story. In October, 1992, Mr. Seale taped an interview with the ABC News program "20/20." Although he was not compensated for this interview, it certainly further publicized his crime and thus in all likelihood increased the marketability of any future literary or film versions of his story.

Although Mrs. Seale presumably possesses a corresponding ability to sell her story, she has taken no steps toward that end and has expressed no interest in doing so. Unlike Mr. Seale, she has not retained an agent. At sentencing, she represented to the district court that she had "been inundated since her arrest with a plethora of offers for books, movie rights, and interviews," but that, "being of the view that the appropriate venue for discussion and inquiry into the offense conduct is [the district court,]" she had ignored all such inquiries and requests. Mrs.

Seale's app. at 31. Her attorney submitted a copy of a newspaper article reporting that interest in the Seales' story had waned and there may not be a market for a book. *Id.* at 33–34. In the same article, the United States Attorney prosecuting this case agreed that he did not see a book as "a real marketable item."

The district court nonetheless decided that both Mr. and Mrs. Seale might become able to pay a fine due to their ability to sell their stories. It then decided to depart from the applicable Guidelines fine range and to impose the statutory maximum fine in each case. While we agree with the district court's conclusion that Mr. and Mrs. Seale each have the future ability to pay a fine given the applicable burden of proof and standard of review, we cannot agree with its decision to depart upward in imposing their fines.

## B.

The Sentencing Reform Act of 1984, 18 U.S.C. § 3551 *et seq.*; 28 U.S.C. §§ 991–98, and the resulting Guidelines transformed sentencing from a matter entirely subject to the district court's discretion within certain statutory parameters to one in which that discretion is greatly limited and is subject to more elaborate procedures in its exercise. *See generally Mistretta v. United States,* 488 U.S. 361, 363–68, 109 S.Ct. 647, 650–53, 102 L.Ed.2d 714 (1989). Under the sentencing system previously in effect, a district court could impose whatever fine it wished, if any, up to a statutory maximum established by Congress. Under the present system, a district court must impose a fine "in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." Guidelines § 5E1.2(a);[6] *United States v. Ferrin,* 994 F.2d 658, 666 (9th Cir.1993). The Guidelines as we have limited them, *cf. United States v. Spiropoulos,* 976 F.2d 155 (3d Cir.1992), further require that a district court must impose

---

**6.** We refer to the version of the Guidelines in effect as of the dates the Seales were sentenced, which in this case is the version which became effective on November 1, 1992. 18 U.S.C.

§ 3553(a)(4); Guidelines § 1B1.11(a), policy statement; *United States v. Kopp,* 951 F.2d 521, 526 (3d Cir.1991).

a fine within the specified range, except in cases in which a court decides to depart, a statute requires otherwise or the defendant establishes that "he is not able and, even with the use of a reasonable installment schedule, is not likely to become able to pay all or part of the fine required by the preceding provisions." Guidelines §§ 5E1.2(b), (f), (i) and application note 4.

The district court must make findings regarding a defendant's ability to pay a fine. *United States v. Demes,* 941 F.2d 220, 223–24 (3d Cir.1991). Where the court has created enough of a factual record that it is clear that it considered a defendant's ability to pay, its findings may be deemed adequate. *See United States v. Joshua,* 976 F.2d 844, 856 (3d Cir.1992), *abrogated on other grounds Stinson v. United States,* —— U.S. ——, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993) (upholding imposition of a $3,000 fine on the basis of a finding that the defendant would be receiving money from a judgment entered in his favor). Our review of the sufficiency of the district court's findings is plenary. *Demes,* 941 F.2d at 223–24. We review the court's findings as to whether the defendant was able to pay a fine, as well as its determination of the amount of any fine, for clear error. *Id.*

### 1.

■ The district court in this case relied upon the Seales' future earning capacity in the form of possible story sales in finding that they were each able to pay a fine. Irene Seale argues that the district court's consideration of this factor was error. She claims that the " 'story' of a crime is not an 'asset' to which a speculative value may be assigned for the purpose of justifying the imposition of a fine in the face of undisputed indigency." Mrs. Seale's brief at 13. She asserts that "[a]ll of the cases challenging fines imposed under the Sentencing Guidelines on the basis of the defendant's present or future ability to pay deal with the familiar category of tangible assets.... None of the reported cases deal with the general category of 'intangible assets,' or more particularly with the category of 'untold stories.' " *Id.* at 15.

We do not read the Guidelines as restricting the "ability to pay" inquiry to "assets."

*See generally* Guidelines § 5E1.2. Instead, Congress listed the factors to be considered "[i]n determining whether to impose a fine" as follows:

(1) the defendant's income, *earning capacity,* and financial resources;

(2) the burden that the fine will impose upon the defendant, any person who is financially dependent on the defendant, or any other person (including a government) that would be responsible for the welfare of any person financially dependent on the defendant, relative to the burden that alternative punishments would impose;

(3) any pecuniary loss inflicted upon others as a result of the offense;

(4) whether restitution is ordered or made and the amount of such restitution; [and]

(5) the need to deprive the defendant of illegally obtained gains from the offense....

18 U.S.C. § 3572(a) (quoting only those factors applicable to individual rather than corporate defendants) (emphasis added). *Cf.* Guidelines § 5E1.2(d)(2) ("[i]n determining the amount of the fine, the court shall consider ... any evidence presented as to the defendant's ability to pay ... in light of his earning capacity and financial resources"). Future earning capacity is obviously an appropriate factor to consider. The possession of specialized skills or an advanced degree which might enable one to acquire a well-paying job upon release from prison are factors which courts have considered in determining ability to pay. *See United States v. Blackman,* 950 F.2d 420, 425 (7th Cir.1991); *United States v. Ruth,* 946 F.2d 110, 114 (10th Cir.1991) (both affirming courts' reliance on potential earning capacity in imposing a fine). Similarly, the potential of the sale of story rights in the future has been held to be an appropriate factor on which to base an award of restitution. *See United States v. Fountain,* 768 F.2d 790, 802–03 (7th Cir.1985). We see no reason why it is not an appropriate factor to consider in deciding whether to impose a fine.

■ The statute and the Guidelines speak in terms of "ability to pay" and whether a

defendant is "likely to become able to pay." Guidelines § 5E1.2(a). They do not invite consideration of whether a defendant actually intends to do that which would enable him or her to pay. The distinction here is significant; Irene Seale's disclaimer of any interest in capitalizing on her story in no way diminishes her capability of doing so. A court could not, for example, relieve a defendant of an obligation to pay a fine from the proceeds he or she would receive upon cashing in a presently held winning lottery ticket merely because the defendant chose not to redeem it. We recognize that consideration of Mrs. Seale's ability to sell her story as her sole possible future source of income could create the anomalous result of encouraging her to do so (which is clearly what the district court sought to prevent) in order to pay her fine. This was, however, a proper consideration under Guidelines § 5E1.2(a). At least in cases such as this, when it is a near certainty that the literary and other media rights to the story of a crime are marketable, possible future sales of those rights may be considered when determining whether a defendant is able to pay a fine.[7]

### 2.

We now turn to the question of whether the evidence was sufficient to support the district court's decision that each of the Seales was able to pay a fine. Applying the principles of *Demes* and *Joshua*, we have concluded that the district court sufficiently set forth its findings in this regard; now we must determine whether, using a preponderance of the evidence standard, *United States v. McDowell*, 888 F.2d 285, 290–91 (3d Cir. 1989), it clearly erred in making them.

7. Citing *Simon & Schuster, Inc. v. Members of New York State Crime Victims Board*, —— U.S. ——, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991), Mrs. Seale has also argued extensively on appeal that the district court's imposition of the fines in question constituted "an impermissible burden" on the Seales' First Amendment rights. Mr. Seale seeks to adopt this argument. We are not entirely clear whether, in presenting their First Amendment argument, the Seales are claiming that the district court should not have considered their possible story sales in determining their future ability to pay, or that the basis upon which the district court chose to depart was not appropriate. *See United States v. Schweitzer*, 5 F.3d 44, 48 (3d Cir.1993). In either case, any contention that the district court infringed upon the Seales' First Amendment rights has been waived. The only reference to the First Amendment in the entire record occurred during Mrs. Seale's counsel's claim at sentencing that Mrs. Seale had no intention of publishing her account of the crime and should, therefore, be considered indigent for purposes of assessment of a fine. In this regard, she said the following:

> We haven't made use of the press. The only way Irene Seale is going to get any money is by the use of the press. In this case, the government has used the press, not Irene Seale. I ask you not to penalize her for Arthur Seale's use of the press[,] for what other people have done in this case. Additionally, your Honor, I would say that the only way she might be able to pay a fine is based upon some future money that she might come into. At this point, she has no intentions of making money off of this crime, and the possible income she may receive because of future infor-mation she provides, which we contend is non-existent, shouldn't be used, and in fact, might

have First Amendment problems raised. We would ask that because she's indigent, no fine be imposed.

Mrs. Seale's App. at 89–90. We do not consider Mrs. Seale's counsel's fleeting and vague reference to a possible "First Amendment problem," to have sufficiently raised the issue before the district court, and, absent plain error or manifest injustice, issues not raised before the district court are not preserved for review before us. Fed.R.Crim.P. 52; *United States v. Smitherman*, 956 F.2d 1131 (11th Cir.1992).

Judge Roth does not find that the Seales have waived their First Amendment argument. She does conclude, however, that there has been no First Amendment violation in this case and would distinguish *Simon & Schuster* on the basis that it involved a statutory scheme outside the framework established for criminal sanctions. The Supreme Court found the New York state law to be over-inclusive, as it encompassed works by people who had never been convicted of crime. Further, the New York statute was not narrowly tailored to the compelling state interest of compensating crime victims, as it reached only the assets of a criminal derived from expressive activity pertaining to the crime, rather than reaching all available assets. The Supreme Court found no reason for such selectivity. *Simon & Schuster* does not, however, stand for the proposition that the government cannot recoup the proceeds of expressive activity relating to crime. Rather, the government cannot single out those proceeds for special treatment while ignoring other assets. Although there may be an indirect burden placed upon the Seales' speech, as a sufficiently large fine may deprive them of the financial incentive to speak, this burden is established within the context of the criminal penalty, and the fine is not otherwise selective.

Even in the uncertain area of measuring future income or earning capacity, some degree of certainty is required. In attempting to predict future ability to pay, district courts must be realistic and must avoid imposing a fine when the possibility of a future ability to pay is based merely on chance. *Cf. United States v. Logar,* 975 F.2d 958, 962–64 (3d Cir.1992) (order requiring restitution from presently indigent defendant is appropriate "if it is realistic that defendant ... has a story to write that will be a bestseller"); *United States v. Mahoney,* 859 F.2d 47, 51 n. 6 (7th Cir.1988) (limiting *Fountain, supra*); *see also United States v. Ramilo,* 986 F.2d 333 (9th Cir.1993) (citing cases)[8]. Despite appellants' contentions to the contrary and the emphasis they place on their current lack of income or assets, we are convinced that, given the facts and circumstances surrounding this highly publicized crime, the district court was realistic in finding that the Seales might become able to pay a fine in the future.

Mr. Seale has made it known that he intends to profit from books or movies about his crime. Although he protests that he personally will not enjoy the proceeds of any such venture, the arrangements he has made for disposing of his gains benefit him insofar as they may be held in trust for his children and compensate one of his attorneys for his expenses. Moreover, the assignment which directs all proceeds away from him today could be revoked tomorrow.

Similarly, as to Mrs. Seale, although a much closer question, the district court did not err at this step of the appropriate analysis. Although Mrs. Seale did not intend to sell her story at the time of sentencing, she could at any time change her mind and decide to capitalize on her crime. Certainly she had received several offers, and although she had taken no steps to pursue them, those offers, and the knowledge she possesses about the kidnapping, remain an asset she could capitalize upon if she were to change her mind. Nor are we persuaded that the civil judgment which was to be entered against her should necessarily allow her to demonstrate an inability to pay a fine in the future. That judgment may or may not be for a sum greater than whatever amount she could receive upon selling her story.[9]

In short, the reasons the Seales have proffered for their inability to pay a fine—an assignment of proceeds and a decision not to pursue a sale—each involve an element of choice. The question in this case is not

8. We note that careful, deliberate analysis on the district court's part—concerning both its determination of a future, hypothetical ability to pay a fine and the precise amount of the fine imposed—is crucial today, since the amendment of 18 U.S.C. § 3573 in 1987. Previously, section 3573 permitted a defendant to petition the court to remit or modify a fine upon demonstrating that he or she had made a good faith effort to comply and that changed circumstances had rendered the fine unwarranted. Hence, in the case of Mrs. Seale, the statute would have permitted her to petition for the remittance of her fine upon her release in twenty years if she had, in fact, not sold her story for profit. Under the present statutory scheme, this right no longer exists. Rather, current section 3573 permits only the government to petition for modification or remission of a fine, and only upon the basis of administrative efficacy.

The present statutory scheme severely hampers the court's ability to leave itself a safety valve. Previously, it could have imposed a fine it believed proper and warranted by law, yet enjoyed the leeway of knowing that, if circumstances changed or if assumptions about the future did not come to pass, it would have the authority to modify the fine based upon such new informa-

tion. In the typical case, where a fine is based upon a present ability to pay, such authority is generally not necessary. The Seales, however, present the classic case of why such authority and discretion are appropriately vested in the court: they have no present ability to pay, and their future ability to pay is based upon a hypothetical asset whose valuation is unclear and whose existence is governed by an element of personal choice. We note that courts in this circuit have struggled with their inability to modify a fine which, though legal when imposed, becomes wholly unrealistic given a defendant's later inability to pay. *See, e.g., United States v. Schilling,* 808 F.Supp. 1214, 1219 (E.D.Pa.1992) (despite defendant's request and probation office's recommendation that $25,000 fine be remitted to $2,500, court found that "under current section 3573 defendants do not have the right to petition the courts to remit their criminal fines"); *United States v. Heimbach,* 808 F.Supp. 413 (E.D.Pa.1992) (holding that court lacks the power to remit defendant's fine except on petition of the government).

9. It may be that on remand the district court will be apprised of the amount of judgment if one has been entered.

whether a defendant has access to funds to pay a fine, but whether a defendant chooses to become able to pay. Thus, the issue here is beyond the realm of uncertainty we confronted in *Logar*.[10] We believe it is for the district court initially to determine both the availability of funds and the amount to be allocated toward payment of a fine. Here, the district court did not err in finding that the Seales failed to prove that they are not likely to become able to pay any fine.

### C.

We must next determine whether the district court erred in departing, and departing to the extent it did, when imposing the fines at issue.

■ As noted previously, a district court must impose a fine within the range specified in the Guidelines unless the defendant proves that he or she is unable and is not likely to become able to pay one. Guidelines § 5E1.2(a). In establishing these ranges, the Sentencing Commission

> envision[ed] that for most defendants, the maximum of the guideline fine range ... will be at least twice the amount of gain or loss resulting from the offense. Where, however, two times either the amount of gain to the defendant or the amount of loss caused by the offense exceeds the maximum of the fine guideline, an upward departure from the fine guideline may be warranted.
>
> Moreover, where a sentence within the applicable fine guideline range would not be sufficient to ensure both the disgorgement of any gain from the offense that otherwise would not be disgorged (*e.g.*, by restitution or forfeiture) and an adequate punitive fine, an upward departure from the fine guideline range may be warranted.

Guidelines § 5E1.2, application note 4. *See also* 18 U.S.C. § 3571(d); Guidelines § 1B1.4.

■ There is no reason to draw a distinction between departures from Guidelines fine ranges and departures from Guidelines imprisonment ranges for analytical purposes. *United States v. Graham*, 946 F.2d 19, 21 (4th Cir.1991). Accordingly, we will analyze the district court's departure from the Seales' Guidelines fine ranges under the model set forth in *United States v. Kikumura*, 918 F.2d 1084 (3d Cir.1990). First, we must inquire whether the circumstances relied upon by the district court to justify the departure were adequately considered by the Sentencing Commission. *Kikumura*, 918 F.2d at 1098. This inquiry is two-fold: we examine the district court's findings of fact regarding the existence of those circumstances for clear error; if there was no clear error, we apply plenary review to decide whether the circumstances were adequately considered. (If they were, the decision to depart must be reversed.) *Id.* Second, we must determine whether the fine imposed was reasonable, an inquiry which again "involves at least two subissues: whether factors relied on are appropriate; and whether the degree of departure was appropriate." *United States v. Ryan*, 866 F.2d 604, 610 (3d Cir.1989); *see Kikumura*, 918 F.2d at 1098. Because we conclude that the district court erred at the first stage, we need not reach the second inquiry.

■ In this case, the district court justified upward departures to the maximum statutory fines for each of the Seales by referring to application note 4 (quoted above) and stating,

> [I]t's the Court's intent that neither defendant profit from their [sic] brutal crime. They didn't obtain eighteen and a half million dollars from Exxon, and it's my

10. In *Logar*, 975 F.2d 958 (3d Cir.1992), the district court ordered a defendant whom the government conceded was " 'currently virtually penniless' " to pay $10 million in restitution to the victims of his fraud. *Logar*, 975 F.2d at 962. Unlike this case, in *Logar*, the record contained no indication that the defendant would "come into funds" except "through such 'fortuitous events as an inheritance or stroke of luck.' " *Id.*

We reversed, stating that we would "not put the court in the lottery business." *Id.* at 964. At the same time, however, we noted that "if it is realistic that [a] defendant may inherit a sum from a well-off relative or has a story to write that will be a bestseller, then the district court would be entitled to consider these possible additional sources of income in fashioning a restitution order." *Id.*

intent that they not obtain or direct the payment of any money from exploiting their foiled crimes.

Mrs. Seale's app. at 91–92; *see also* Mr. Seale's app. at 131, 180.

Thus, it is apparent that the court found, as it did in the context of the "ability to pay" inquiry, that the Seales could profit from future story sales if they chose to do so. Moreover, to justify its departures, it found that they would profit to such an extent that a fine within the applicable ranges would not "ensure both the disgorgement of any gain ... and an adequate punitive fine." Guidelines § 5E1.2, application note 4. It thus had to determine what it believed the Seales' potential gain [11] would be.

In making these necessary findings, the district court relied upon Mr. and Mrs. Seale's statements that they had received offers for the rights to their stories. The court also relied upon evidence that Mr. Seale had already contracted with an attorney to negotiate the sale of the rights to his story, and a letter submitted by the government in which a literary agent estimated the amount of money Mr. Seale could receive from selling the rights to his story. Government app. at 101–05. The letter constituted the only evidence regarding dollar amounts, and the literary agent who wrote it had not discussed the case with either Mr. or Mrs. Seale, their attorneys or any other representatives acting on their behalf. While she was familiar with the case because she had followed the newspapers and watched Mr. Seale's "20/20" interview, the agent had no personal knowledge about any of the offers Mr. Seale was considering. Nevertheless, she opined that "this has the makings of a solid true crime book" and estimated that Arthur Seale, working with a collaborator, could earn approximately $600,000 from selling his story, assuming that he sold the rights to a book publisher, earned royalties from magazines

and a television or feature film option, and served as a personal consultant on any film which was made. The literary agent was careful to note that her figures were "hypothetical" and that Mr. Seale would have to share this income with his collaborator.

No other evidence supporting an upward departure from the fine range was introduced at either sentencing hearing. Based only upon this, the court decided at Mr. Seale's sentencing that Mr. Seale might not employ a collaborator. Mr. Seale's app. at 132. Then it *sua sponte* increased the monetary estimates the agent had provided, saying that it "seem[ed] to [the court] that it is not outside the realm of possibility Mr. Seale could receive a substantially larger amount than this, indeed the amount of a million dollars is not beyond the realm of reason if you assume that he did not have a collaborator." *Id.*

### 1.

To ensure that Mr. Seale would not profit from any story sales, the district court departed seven-fold from the maximum fine dictated by the Guidelines, ordering him to pay a fine that exceeded the top of the applicable range by $1.5 million. We consider this seven-fold, $1.5 million departure from the maximum of the applicable Guidelines range to be the type of "extreme context" which requires that the district court use a clear and convincing standard of proof when finding supporting facts. *See Kikumura*, 918 F.2d at 1100–02 (a twelve-fold, 330–month departure from the median of the applicable Guidelines imprisonment range requires use of a clear and convincing standard); *United States v. Townley*, 929 F.2d 365 (8th Cir.1991) (in *dicta*, court stated that determination of amount of drugs included in relevant conduct which produced a seven-fold increase in sentencing range might require proof by clear and convincing evidence).[12]

11. Because we dispose of this appeal on another ground, we leave for another day the issue of whether the "gain" discussed in application note 4 must be "illegally obtained gain" as provided in 18 U.S.C. § 3572(a).

12. The government argues that we should not employ a *Kikumura* analysis in this case because

the district court decided to depart in accordance with 18 U.S.C. § 3571(d) and application note 4 to Guidelines § 5E1.2. In essence, it argues with regard to both Mr. and Mrs. Seale that the district court did not depart from the Guidelines fine range at all because the statute and the Guidelines provide that the true maximum of any fine range is twice the pecuniary

Earlier in this opinion, we used the analogy of a defendant holding a winning lottery ticket as an example of a person possessing the future ability to acquire proceeds toward payment of a fine for purposes of Guidelines § 5E1.2(a), despite a present intention not to redeem it. We draw upon the analogy here to help place in context the question of the value to be assigned to a future ability to pay a fine. If, for example, the evidence established that the defendant is the only person holding the lottery ticket and that its redeemable value is $1 million, it is entirely conceivable that a district court could depart from the applicable Guidelines range and impose a fine equal to the amount the evidence shows the ticket is worth, or $1 million. If, on the other hand, a number of other individuals also hold winning tickets, but the evidence presented at sentencing fails to disclose that number and only hypothesizes how many others there might be, then the district court could only determine the potential value of the ticket to the defendant, for purposes of enhancing his or her fine beyond the Guidelines range by speculating as to the number of other persons who might hold the same winning ticket. In the latter context, a decision to depart from the Guidelines fine range to capture all of the anticipated lottery winnings might, depending upon the strength of the evidence and the amount of the anticipated departure, be unsupportable.

This helps explain why, when we view the evidence placed before the district court in this case through the lens of a clear and convincing standard of proof, we are compelled to conclude that it erred in finding that Arthur Seale could profit to the tune of as much as $1 million from selling the rights to his story. Although Mr. Seale had expressed an intention to profit from his crime, the letter the government submitted to support its argument that a departure was justified—by its own terms—contained only "hypothetical" figures proffered by a person who had no knowledge of the offers which were being considered. Moreover, from our examination of the record we are unable to discern any basis for the district court's conclusion that Mr. Seale might not employ a collaborator and might earn even more money than the agent had hypothesized. Thus, we cannot sustain the district court's decision to depart in imposing Mr. Seale's fine since its factual findings are chiefly rooted in speculation and are, therefore, clearly erroneous in light of the appropriate standard of proof.

2.

■ The facts supporting departure with regard to Mrs. Seale's fine are even less compelling, and we reach a similar conclusion even though we do not require proof by clear and convincing evidence in her case. Because the district court departed to impose a fine which was only twice the maximum of Mrs. Seale's fine range, the preponderance of the evidence standard, rather than one of clear and convincing evidence, applies. *Cf. Kikumura,* 918 F.2d at 1100 (proof by a preponderance of the evidence is sufficient to support findings underlying a six-level increase in offense level, which would roughly result in a doubling of the applicable sentencing range). Even under a preponderance of the evidence standard, however, we conclude that the findings underlying the district court's decision to depart in imposing Mrs. Seale's fine are grounded more in speculation than in fact and are, therefore, clearly erroneous.

The evidence we have recited pertains, for the most part, to Mr. Seale. As noted, although Mrs. Seale had received several of-

gain to the defendant or twice the loss to victims. Since the district court found that Mr. Seale stood to realize a pecuniary gain of $1 million, the government argues, his fine of $1.75 million was not beyond the statutory or the Guidelines maximum; by analogy, Mrs. Seale's $500,000 fine was similarly within the applicable range. We decline this invitation to relax the evidentiary standards applicable to extreme departures merely because those departures are specifically authorized in the Guidelines. As the text of the application note reveals, the district court's ac-

tions constituted departures whether it was attempting to sentence the Seales in accordance with the alternative minimum fine provision or not. Because such attempts are indeed departures, our reasoning in *Kikumura* requires procedural safeguards over and above those normally used when the magnitude of the resulting sentence becomes the " 'tail which wags the dog of the substantive offense.' " *Kikumura,* 918 F.2d at 1100–01 (quoting *McMillan v. Pennsylvania,* 477 U.S. 79, 88, 106 S.Ct. 2411, 2417, 91 L.Ed.2d 67 (1986)).

fers for her story, she had neither retained an agent nor engaged in any negotiations to sell her story. The only evidence the government presented as to the potential value which may be assigned to any story was the letter describing Mr. Seale's potential gains. Even if the marketability of the two stories does not differ in any significant way, we have already concluded that the evidence relied upon to determine the value of Mr. Seale's story was, at best, speculative. The speculation is compounded in Mrs. Seale's case because the district court had no record evidence specifically applicable to her upon which to base its decision. Accordingly, Mrs. Seale's fine also must be vacated for lack of an evidentiary foundation.

### III.

In conclusion, we recognize the difficulty district court judges face when they must look to the future to settle on a defendant's ability to pay a fine and to determine what that fine should be. District courts must abide by varying standards of proof, depending upon the level of departure, if any, in assessing the sufficiency of the evidence in each such instance. We emphasize, however, that while it is entirely proper in cases such as this for district courts to look to potential sales of literary and other media rights as a source of future income when determining whether defendants may become able to pay fines, the value of those rights must be supported by more than hypothesis or speculation to justify departures from the applicable Guidelines fine range. This is especially so where Congress has chosen to permit only the government to initiate a petition for modification of a fine if circumstances change so that a defendant is truly unable to pay it. We will vacate the fines imposed by the district court as to each of the Seales, and we will remand this case for resentencing. On remand, the district court is to apply the principles set forth in *Logar* in resentencing both appellants within their respective applicable fine ranges.