261 F.3d 271 (2nd Cir. 2001)
 UNITED STATES OF AMERICA, APPELLEE,
v.
MOHAMMAD A. SALAMEH, NIDAL AYYAD, AHMAD MOHAMMAD AJAJ, ALSO KNOWN AS KHURRAM KHAN, MAHMOUD ABOUHALIMA, ALSO KNOWN AS MAHMOUD ABU HALIMA, DEFENDANTS-APPELLANTS,
RAMZI AHMED YOUSEF, BILAL ALKAISI, ALSO KNOWN AS BILAL ELQISI, ABDUL RAHMAN YASIN, ALSO KNOWN AS ABOUD, ABDUL HAKIM MURAD, ALSO KNOWN AS SAEED AHMED, EYAD ISMOIL, ALSO KNOWN AS EYAD ISMAIL, WALI KHAN AMIN SHAH, ALSO KNOWN AS GRABI IBRAHIM HAHSEN, DEFENDANTS.
 Docket No. 99-1619(L), 99-1620(CON), 99-1621(CON), 99-1623(CON)
August Term, 2000
 UNITED STATES COURT OF APPEALS, SECOND CIRCUIT
 Argued: April 18, 2001
Decided August 6, 2001
 
 Appeal from the sentences imposed by the United States District Court for the Southern District of New York (Kevin Thomas Duffy, Judge) following convictions for crimes related to the bombing of the World Trade Center.
 AFFIRMED, as modified on appeal.[Copyrighted Material Omitted]
 Karl Metzner, Assistant United States Attorney, for Mary Jo White, United States Attorney for the Southern District of New York (David Berardinelli and Baruch Weiss, Assistant United States Attorneys, on the brief), for Appellee.
 Frank Handelman, New York, Ny, for Defendant-Appellant Salameh.
 Francisco Celedonio, New York, Ny, for Defendant-Appellant Ayyad.
 Maranda E. Fritz, Fritz & Miller, New York, Ny, for Defendant-Appellant Ajaj.
 Lawrence Mark Stern, New York, Ny, for Defendant-Appellant Abouhalima.
 Before: McLAUGHLIN, Calabresi, Pooler, Circuit Judges.
 
 Per Curiam
 
 1
 Defendants-appellants Mohammad A. Salameh, Nidal Ayyad, Ahmad Mohammad Ajaj, and Mahmoud Abouhalima were convicted and sentenced in United States District Court for the Southern District of New York (Duffy, Judge) following a jury trial on numerous charges arising out of their involvement in the February 1993 bombing of the World Trade Center in New York City. In a previous appeal, we affirmed the convictions, but, because defendants had been sentenced without an adequate waiver of their right to counsel, we remanded for resentencing; we also declined to address certain asserted grounds for a new trial and remanded for them to be adjudicated by way of post-trial motions in the district court. See United States v. Salameh, 152 F.3d 88 (2d Cir. 1998). On remand, the district court resentenced the defendants and denied their motions for a new trial.
 
 
 2
 In a separate summary order filed today, we affirm the district court's denial of the post-trial motions. In this opinion, we consider appellants' challenges to their sentences.
 
 
 3
 On appeal, defendants argue principally (1) that the district court used an improper method to calculate terms of imprisonment one month short of each defendant's life expectancy, (2) that in imposing fines and restitution the district court failed to take adequate account of defendants' current indigency and improperly considered the possibility of future income that might become available from the sale of accounts of their crimes, and (3) that the district court erred in imposing on each defendant two consecutive sentences for firearm offenses under 18 U.S.C. § 924(c). Ajaj also contends that, in various ways, his sentence was disproportionate to his level of involvement in the bombing.
 
 
 4
 We modify the fines and the restitution orders and, in all other respects, affirm the sentences.
 
 Background
 
 5
 The facts of this case were extensively described in our previous opinion and need not be reiterated here except as noted below. All four defendants were convicted on Count One, conspiracy (a) to bomb buildings used in interstate and foreign commerce, 18 U.S.C. § 844(i), (b) to bomb property of the United States, id. § 844(f), (c) to transport explosives in interstate commerce for the purpose of damaging or destroying property, id. § 844(d), and (d) to bomb automobiles used in interstate commerce, id. § 33. Each was also found guilty on substantive counts corresponding to the objects of the conspiracy charged in Count One, to wit: Count Two, bombing the World Trade Center (WTC), a building used in interstate and foreign commerce; Count Three, bombing the federal offices and vehicles located in the WTC; Count Four, transporting the WTC bomb from New Jersey to New York; Count 5, destroying the Ryder truck that carried the bomb and that was used in interstate commerce; and Count Six, destroying other nearby vehicles that were used in interstate commerce. Additionally, all four were convicted on Count Eight, of assaulting federal Secret Service agents as a result of the bombing, 18 U.S.C. § 111. And finally, each was also convicted on Counts Nine and Ten, 18 U.S.C. § 924(c), for using or carrying a bomb during, and in relation to, Count One (the conspiracy) and Count Eight (the assault). Apart from these convictions which applied to all four defendants, Ajaj was also convicted on Count Seven, traveling in foreign commerce with intent to promote, facilitate,and commit crimes of violence, 18 U.S.C. § 1952, and Salameh and Abouhalima were convicted on Counts Eleven and Twelve, respectively, pertaining to false statements to the INS, 18 U.S.C. § 1546(a). There were no acquittals.
 
 
 6
 At resentencing, Judge Duffy sentenced each defendant (1) on Counts 1-6 & 8, to a sentence designed to be one month short of life expectancy, (2) on Counts Nine and Ten (the § 924(c) counts), to two consecutive additional 30-year sentences, (3) on the miscellaneous counts (7, 11, 12), to additional concurrent sentences, (4) to a $250,000 fine, and (5) to $250 million in restitution. The exact prison time imposed under Counts 1-6 & 8 varied among the defendants according to their ages. The total sentences were as follows: Salameh 1,403 months, Abouhalima 1,300 months, Ayyad 1,405 months, and Ajaj 1,378 months.
 
 Discussion
 I. Calculation of Life Expectancy
 
 7
 Judge Duffy determined that, under the Sentencing Guidelines, defendants' crimes in Counts 1-6 & 8 merited a life sentence under Guideline § 2A1.1, the section that applies to first-degree murder and to arsons resulting in death. See United States v. Tocco, 135 F.3d 116, 130-31 (2d Cir. 1998); Guideline § 2K1.4(c) (cross-referencing homicide guidelines when death results from use of an explosive against property); id. § 2A1.1, cmt. n. 1 (noting that the first-degree murder guideline is appropriately applied to certain felony murders). At the time of defendants' crimes, however, the applicable penalty statute provided that a life sentence could be imposed only if so directed by the jury, see 18 U.S.C. § 34 (1993), and the jury in this case was not asked to consider whether such a sentence was appropriate.
 
 
 8
 In 1994, after the crimes but before sentencing, Congress amended the statute to delete the jury directive requirement, but Judge Duffy determined that he was bound by the earlier version of the statute, as we had strongly suggested in Tocco, 135 F.3d at 132. Accordingly, he followed the procedure, approved in Tocco, of imposing a term of years that, if defendants lived to exactly their life expectancy as of the time of sentencing, would expire one month before their deaths. Judge Duffy determined the appropriate length of sentence by assuming, first, that each defendant would live to the age expected of a white male member of the general United States population who was born in the same year as defendant, and, second, that each defendant would receive the maximum "good time" credit allowable, see 18 U.S.C. § 3624(b). The relevant life expectancies were derived from a federal vital statistics report. Appellants argue (a) that this method of calculating their sentence was unfair insofar as adding on expected good-time credit lengthened the sentence beyond their life expectancy and (b) that the life expectancy figures did not reflect the shorter life spans of non-white, foreign-born persons who spend substantial periods of time in prison.
 
 
 9
 We need not, however, delve into Judge Duffy's methods because appellants have no legal right to a sentence that is shorter than their correct life expectancy. While these appeals were pending, we held in United States v. Joyner, 201 F.3d 61 (2d Cir. 2000), that defendants, who were sentenced after the effective date of the 1994 amendments to § 34, could be sentenced to life in prison for pre-amendment crimes even absent a jury directive. In Joyner we reasoned that the amendment in question affected only the division of labor between judge and jury, and not the maximum penalty authorized by law. See id. at80. Accordingly, since defendants had no right to avoid a sentence that was tantamount to life imprisonment, any errors in calculating their sentences were harmless.
 
 II. Fines and Restitution
 
 10
 Appellants argue that the $250,000 fine and $250,000,000 in restitution imposed upon each of them failed to take adequate account of their indigency. We review these aspects of the sentence for an abuse of discretion. See United States v. Wong, 40 F.3d 1347, 1383 (2d Cir. 1994); United States v. Lavin, 27 F.3d 40, 42 (2d Cir. 1994).
 
 
 11
 The sentencing court must consider a defendant's indigency when determining the appropriate amount of fines. See Tocco, 135 F.3d at 132-33. And it is ordinarily an abuse of discretion to impose a fine that exceeds a defendant's ability to pay. See Wong, 40 F.3d at 1383. The burden of establishing inability to pay rests on defendant. See United States v. Thompson, 227 F.3d 43, 45 (2d Cir. 2000); Wong, 40 F.3d at 1383. Moreover, the court may consider both defendant's present financial resources and those that may become available in the future. See Thompson, 227 F.3d at 45-46; Wong, 40 F.3d at 1383.
 
 
 12
 Here, it was undisputed that defendants were indigent at the time of sentencing. Judge Duffy plainly understood as much, but he determined that the level of media interest in the World Trade Center bombing was such that "[t]his is a case where [a] real possibility exists that you will be in position to receive large amounts of money." In support of this conclusion, Judge Duffy cited a number of specific television shows and books concerning the bombing, as well as two occasions on which different co-conspirators had suggested some interest in writing a book.
 
 
 13
 In light of the considerations cited by the district court, and in the absence of any evidence from defendants to counter the inference that future income from media contracts was a substantial possibility, we find that the court acted within its discretion in basing the fines on defendants' future earnings potential. Indeed, this is precisely the sort of case anticipated in Wong, where, while rejecting a fine based on the "remote fortuity" that a defendant would win the lottery, we contrasted the speculative nature of such a fine with one where "defendants in [a] `highly publicized crime' might be able to generate future income `from books or movies about [the] crime.'" 40 F.3d at 1383 (quoting United States v. Seale, 20 F.3d 1279, 1286 (3d Cir. 1994)) (second alteration in original). Similar considerations justify our approval of the restitution order. See United States v. Giwah, 84 F.3d 109, 114 (2d Cir. 1996) (explaining that a sentencing judge must consider a defendant's indigency, but that once he has done so, our review is "extremely deferential").
 
 
 14
 Appellants also argue that even if (based on the potential for future earnings) the amount of the fines and restitution is permissible, the realization of that potential is sufficiently uncertain as to make the timing of payment imposed by Judge Duffy improper, since his judgment specified immediate payment. The government agrees and, indeed, argues that Judge Duffy's oral pronouncement of sentence contemplated that the fines and restitution would be made contingent on defendants' receipt of monies from any media contracts that might be forthcoming.
 
 
 15
 "Where an unambiguous oral sentence conflicts with the written judgment, the constitutional right of a defendant to be present at sentencing dictates that the oral pronouncement of sentence must control." United States v. A-Abras Inc., 185 F.3d 26,29 (2d Cir. 1999). Accordingly, the government urges us to correct the judgment on our own, rather than remanding the case for resentencing in the district court. Cf. S.E.C. v. Palmisano, 135 F.3d 860, 863-64 (2d Cir. 1998) (modifying a civil judgment to include a setoff); United States v. Harris, 367 F.2d 826, 827 (2d Cir. 1966) (revising a criminal judgment "in the exercise of the peculiar power of the federal courts to revise sentences in contempt cases" (internal quotation marks omitted)).
 
 
 16
 In this court, the parties have stipulated that the entire amount of both the fines and the restitution should, in conformity with Judge Duffy's oral pronouncements, be made contingent upon the realization of future earnings from media contracts and that, in the absence of such earnings, defendants will not be required to pay any fines or restitution, even though they may have minor earnings from other sources such as prison wages. We accept that stipulation and affirm the district court's imposition of a $250,000 fine and $250,000,000 in restitution,[1] but modify the judgments so that each defendant's fine and restitution obligations come due only if he receives income from the sale of his account of the World Trade Center bombing or of the events leading up to it.[2]
 
 III. The § 924(c) Firearm Counts
 
 17
 In addition to the terms of imprisonment placed on the defendants for their convictions on Counts 1-6 & 8, the district court imposed two further, consecutive, 30-year terms of imprisonment for their convictions on Counts 9 & 10, which asserted that the defendants had used or carried a firearm in connection with a crime of violence. See 18 U.S.C. § 924(c); see also 18 U.S.C. § 921(a)(3)-(4) (defining "firearm" to include "any destructive device" and "destructive device" to include any bomb). Count 9 alleged use or carriage of a firearm with respect to the underlying crime of assaulting a federal officer, which was charged in Count 8. Count 10 alleged use or carriage of a firearm with respect to the underlying crime of conspiracy charged in Count 1.
 
 
 18
 Defendants make two arguments for treating one or both of these additional sentences as improperly duplicative. First, they contend that the sentences under § 924(c) are erroneous because the statutes defining the underlying crimes charged in Counts 1 and 8 themselves contain provisions enhancing the statutory penalties when a defendant uses an explosive device to carry out the crime. Second, they argue that, even if each § 924(c) sentence is correct when viewed in isolation, it is improperly duplicative for the defendants to receive two § 924(c) convictions for the use or carriage of an explosive device with respect to a single course of criminal conduct. Neither argument justifies a reduction in sentence on the facts of this case.
 
 
 19
 As a preliminary matter, we note that there is generally no constitutionalbar to the imposition, within a single criminal proceeding, of multiple punishments for the same criminal conduct. This is so because double jeopardy principles do "no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." United States v. Khalil, 214 F.3d 111, 117 (2d Cir. 2000) (internal quotation marks omitted). Nonetheless, as a matter of statutory construction, we are reluctant to "`turn[] a single transaction into multiple offenses.'" United States v. Lindsay, 985 F.2d 666, 672-73 (2d Cir. 1993) (quoting Bell v. United States, 349 U.S. 81, 84 (1955)). We therefore impute to Congress the intent to impose separate punishments for the same underlying conduct only when Congress has clearly articulated that intent. See United States v. Mohammed, 27 F.3d 815, 819 (2d Cir. 1994).
 
 
 20
 Viewed in this light, defendants' first argument, which refers to what one might call the "vertical" relationship between each § 924(c) count and its underlying crime of violence, has been foreclosed by a clear act of Congress. Defendants rely heavily on Busic v. United States, 446 U.S. 398 (1980), in which the Supreme Court ruled that "prosecution and enhanced sentencing under § 924(c) is simply not permissible where the predicate felony statute contains its own enhancement provision." Id. at 404. But after Busic, Congress amended § 924(c) to apply to firearm use connected with any crime of violence "including a crime of violence... that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device." See United States v. Gonzales, 520 U.S. 1, 10 (1997) (noting that Congress "repudiated" Busic). Accordingly, the imposition of separate § 924(c) sentences is not defeated by the fact that the violent crimes underlying the § 924(c) convictions themselves provide for enhanced penalties for use of explosives. See Khalil, 214 F.3d at 119; see also Mohammed, 27 F.3d at 819-20 (allowing double punishment pursuant to § 924(c) even if every violation of the underlying criminal statute necessarily also constituted a violation of § 924(c)).
 
 
 21
 Defendants' second argument, which pertains to what one might call the "horizontal" relationship between the two separate § 924(c) counts, also fails. At the outset, we note that during the pendency of this appeal, this court rejected the government's primary theory in defense of this part of the sentences. In United States v. Finley, 245 F.3d 199 (2d Cir. 2001), we refused to accept the notion that multiple § 924(c) convictions are permissible whenever the underlying crimes pass the Blockburger test, i.e. "`whether each [alleged crime] requires proof of a fact which the other does not,'" United States v. Gore, 154 F.3d 34, 44 (2d Cir. 1998) (quoting Blockburger v. United States, 284 U.S. 299, 304 (1932)).[3] And, as a result, we invalidated one of two § 924(c) convictions that arose from "two predicate offenses... and a single gun continually possessed." Finley, 245 F.3d at 206.[4]
 
 
 22
 The Finley defendant had been charged with both drug distribution and drug possession with intent to distribute after (a) an undercover officer made a purchase (the distribution count) and (b) the raid,which followed immediately, revealed some remaining stock (the possession count). A firearm was inside the house from which defendant was selling. See id. at 201-02. We ruled that "[t]he statute does not clearly manifest an intention to punish a defendant twice for continuous possession of a firearm in furtherance of simultaneous predicate offenses consisting of virtually the same conduct." Id. at 207 (emphasis added). See also United States v. Wilson, 160 F.3d 732, 749 (D.C. Cir. 1998) (holding that where "there is only one firearm and one use, but two underlying offenses" there is only one 924(c) violation); but see United States v. Casiano, 113 F.3d 420 (3d Cir. 1997); United States v. Floyd, 81 F.3d 1517 (10th Cir. 1996); United States v. Andrews, 75 F.3d 552 (9th Cir. 1996); United States v. Nabors, 901 F.2d 1351 (6th Cir. 1990).
 
 
 23
 Defendants would analogize this case to Finley by saying that here we have two separate underlying crimes but only a single "use" of a firearm, that is, the explosion of the bomb in the World Trade Center. Even with the issue framed this way, Finley is arguably distinguishable because the conspiracy charged in Count 1 involved a range of time and conduct far broader than the assault charged in Count 8. But we need not decide that question because we are not here faced with a situation in which defendants' § 924(c) convictions rest on a single "use" of the firearm in question.
 
 
 24
 In the case before us, defendants' convictions on the substantive counts entailed jury findings that they had both carried the bomb from New Jersey to New York and used the bomb by detonating it in the World Trade Center.[5] Of particular significance is the fact that transportation of the bomb, independent of its later detonation, is conduct that Congress has chosen to criminalize under a distinct statute, 18 U.S.C. § 844(d). Moreover, that very transportation was one of the objects of the conspiracy for which defendants were convicted and which underlay the § 924(c) charges in Count 10.[6] Given the separate, and separately culpable, nature of defendants' use and carriage of the bomb, we conclude that, on the facts of this case, the concerns that underlay our holding in Finley do not apply here.
 
 IV. Ajaj's Culpability
 
 25
 Ajaj argues (a) that his involvement in the actual bombing was sufficiently attenuated as to make inappropriate the § 2A1.1 guideline for first-degree murder, (b) that he should have been granted a mitigating role reduction in his offense level, and (c) that Judge Duffy should have departed downward. These arguments are meritless.
 
 
 26
 As discussed above, the first-degree murder guideline is properly applied to arsons resulting in death, even if a defendant did not know or intend that death would result. See Tocco, 135 F.3d at 130-31. Lack of such mens rea may provide the basis for a downward departure, but such a departure is not mandatory and its denial is unreviewable absent circumstances not present here. See id. at 131. This framework, moreover, is equally applicable to convictions for conspiracy and, on a Pinkerton theory, for substantive crimes. See United States v. Diaz, 176 F.3d 52, 123-24 (2d Cir. 1999); United States v. Nichols, 169 F.3d 1255, 1272-75 (10th Cir. 1999); U.S. Sentencing Guidelines § 2X1.1. It follows that the district court correctly applied § 2A1.1.
 
 
 27
 With regard to the fact-sensitive question of whether a defendant merits a mitigating role reduction, we review for abuse of discretion the district court's application of the Guidelines to the circumstances of the particular case before it. See United States v. Kang, 225 F.3d 260, 261-62 (2d Cir. 2000); United States v. Aponte, 31 F.3d 86, 88 (2d Cir. 1994). Here, Ajaj's argument rests entirely on the claim that his culpability was less than that of other co-conspirators in this case. But even if this were so, to qualify for a role reduction he must show that his role was "minor" or "minimal" relative to both his co-conspirators in this crime and to participants in other arson conspiracies leading to death. See United States v. Ajmal, 67 F.3d 12, 18 (2d Cir. 1995). In the instant case, we earlier concluded that "the government's argument at trial that Ajaj not only agreed to the essential nature of the plan but was one of the conspiracy's architects enjoyed solid evidentiary support." Salameh, 152 F.3d at 153. Under the circumstances, Judge Duffy was well within his discretion in finding that Ajaj was not "less culpable than most other participants," U.S. Sentencing Guidelines § 3B1.2, cmt. n. 3 (standard for "minor" role), let alone among the "least culpable" participants, id. cmt. n.1 (standard for "minimal" role), relative to the "the average participant in such a crime." United States v. Rahman, 189 F.3d 88, 159 (2d Cir. 1999).
 
 Conclusion
 
 28
 We have considered all of defendants' arguments as to sentencing and, except as noted above with regard to the fines and restitution orders, we have found them to be meritless. Accordingly, we AFFIRM the sentence imposed by the district court, as modified in the manner described above and with the opportunity for the objection stated in note 2.
 
 
 
 NOTES:
 
 
 [1]
 We note that defendants have made additional arguments concerning the fines and restitution, but, having considered each of them, we reject them as meritless.
 
 
 [2]
 In light of the serious issues that may attend an appellate court's modification of the sentence imposed by the district court, and in order to avoid any future disagreements about the nature of the stipulations elicited in this court, we will allow each defendant 14 days from the date this opinion is filed to inform us if he objects to this modification on the ground that it deviates from the district court's oral pronouncement of sentence and exceeds the scope of the stipulations on appeal, thereby potentially trenching on defendants' right to be present at sentencing.
 
 
 [3]
 Following oral argument, we solicited and received from the parties supplemental briefing on the applicability of Finley to this case.
 
 
 [4]
 In Finley, we also ruled that the two predicate offenses were not multiplicitous under Blockburger. See Finley, 245 F.3d at 205-06.
 
 
 [5]
 Because we can be confident that, in the course of reaching verdicts on the substantive counts, the jury found facts entailing § 924(c) liability for carrying an explosive device in connection with Count 1 and using an explosive device in connection with Count 8, defendants could not have been harmed by any failures in the jury instructions to delineate adequately the different potential grounds for § 924(c) liability. United States v. Malpeso, 115 F.3d 155, 165-67 (2d Cir. 1997). In particular, we note that defendants' convictions on Count 4 entailed a jury finding that they had carried a bomb in interstate commerce. In any event, defendants did not object to the district court's instructions regarding § 924(c). See United States v. Washington, 861 F.2d 350, 352 (2d Cir. 1988).
 
 
 [6]
 Because of these facts, our holding does not necessarily entail, as defendants warn that it would, that there may be two § 924(c) convictions every time a defendant carries and then uses a firearm in the course of a criminal scheme. We leave to future cases the further refinement of Finley's scope.