**UNITED STATES of America, Appellee,**

v.

**Thomas TOCCO, Defendant,**

**Mario Ferranti; Jack Ferranti, Defendants–Appellants.**

**No. 760, Dockets 96–1282, 96–1266.**

United States Court of Appeals, Second Circuit.

Argued Feb. 4, 1997.

Decided Jan. 16, 1998.

**120**

Vivian Shevitz, Mt. Kisco, NY (Jane Simkin Smith, Carol E. Gette, Mt. Kisco, NY, of counsel), for Appellant Jack Ferranti.

Lauren J. Resnick, Assistant United States Attorney, Brooklyn, NY (Zachary W. Carter, United States Attorney, Emily Berger, Assistant United States Attorney, Eastern District of New York, Brooklyn, NY, of counsel), for Appellee United States of America.

Before: WINTER, Chief Judge, CARDAMONE and CABRANES, Circuit Judges.

CARDAMONE, Circuit Judge:

This criminal prosecution arose out of a late-night fire in a three-story building in Queens, New York, on February 24, 1992 during which a firefighter lost his life. The subsequent investigation focused on the defendant Jack Ferranti (defendant or appellant) as the person who set the blaze in an effort to cut his losses from a failing business and to profit through the collection of insurance proceeds. Ferranti appeals from a judgment of the United States District Court for the Eastern District of New York (Weinstein, J.), convicting him following a two-week jury trial of arson homicide in violation of 18 U.S.C. § 844(i), arson conspiracy in violation of 18 U.S.C. § 371, 16 counts of mail fraud in violation of 18 U.S.C. § 1341, and witness tampering in violation of 18 U.S.C. § 1512(b).

On appeal Ferranti raises a number of issues of apparent legal substance, one or two of which are matters of first impression, challenging his conviction for arson homicide and a sentence of 435 months in prison—a period of time five years longer than his life expectancy. Although these legal challenges are skillfully articulated, they turn out, upon close analysis, to be unpersuasive and only hopeful thoughts. Therefore, for the reasons given below, we affirm.

## BACKGROUND

### I  The Fire

Defendant Jack Ferranti owned a retail clothing store called "Today's Styles" which he operated in space he rented on the ground floor of a building located at 64–65 Grand Avenue in Maspeth, Queens. The two upper floors of the building consisted of four occupied residential apartments that housed eight people. At 5 p.m. on February 24, 1992 store employee Teresa Rodriguez closed the store. Just before 11 p.m., a witness saw

smoke pouring out from the side of the building and called the fire department. When it responded and the fire trucks arrived at the scene, two firefighters entered the building and went to the second floor to see if any people were trapped inside. During the search one of the firefighters fell to his death from a second-story window. Two dozen other firefighters suffered minor injuries, and several building residents were treated for smoke inhalation. The structure was destroyed, its residents left homeless.

After successfully fleeing the burning building, two residential tenants, Shelley and Michelle Anthony, spoke briefly with a man who asked them if all of the residents had escaped the fire. From a series of photographs, Shelley Anthony later identified defendant Thomas Tocco as the man with whom he spoke on the night of the fire. Although unable to make a definitive identification, Tocco's photograph was one of two or three that Michelle Anthony selected from the series presented to her.

The following morning investigators found evidence indicating that the fire was arson committed by someone with access to the retail store because there was no evidence of forced entry. Two distinct flammable liquid patterns were found on the floor of the dressing room area in the rear of the retail store that investigators believed had been intentionally placed several feet apart and ignited. Between the two patterns was a portable electric heater plugged into the wall. Investigators concluded that whoever set the fire intended to lead them to believe that it was caused by a malfunction in the heater. Testing by the FBI laboratory, however, found no evidence to suggest that the heater's circuit was "energized" at the time of the fire, i.e., there was no electrical arcing, and therefore investigators concluded that the unit could not have been the cause of the fire's ignition.

Ferranti initially told investigators that he had been out of town for several days when the fire occurred. He also said that a former employee, whom he had since fired, had purchased the heater for the store a couple of years earlier. When questioned by police, that employee denied making such a purchase. While Rodriguez, a current employee, initially told police there had been a portable heater at the store, her friend, Betzida Aviles, who had been at the store on the day of the fire, told police that there was no heater there. Before the grand jury, Ms. Rodriguez recanted, testifying that Ferranti had met with her on the morning after the fire at his real estate office in Manhattan and instructed her to lie to the investigators and tell them that there had been a portable electric heater at the store.

In the weeks following the fire, Ferranti filed a claim with his insurance company under his fire policy. The company asked attorney Stuart Markowitz to handle its investigation of the Today's Styles fire, and Markowitz corresponded with Ferranti and his representative requesting information about the fire. On June 11, 1992 after the company had examined Ferranti under oath and requested an examination of employee Rodriguez, Ferranti wrote the company withdrawing his insurance claim.

Defendant was subsequently indicted, along with his brother, Mario Ferranti, and Thomas Tocco, on charges of arson homicide, arson conspiracy, witness tampering, and mail fraud. Ferranti and his brother successfully moved for severance, and their case proceeded to trial separately from co-defendant Tocco.

## II The Trial Proceedings

At trial the government developed the connection between defendant Ferranti, his brother Mario, and Tocco. In addition to the Anthonys' identification of Tocco at the fire scene, another witness testified that she had seen a dark-colored Cadillac matching the description of Tocco's car parked across the street from the building 10 to 15 minutes before she noticed smoke coming from inside it. She also stated that when she later observed the fire, the Cadillac was gone. Government witness Vincent Marziano, a convicted felon and friend of Tocco and Mario Ferranti, provided the link between Tocco and Ferranti. Marziano testified that at 2 a.m. on the night of the fire, Tocco came to his Bronx home and told him that he and Mario Ferranti had just set a Queens building on fire for Jack Ferranti. One week

later, Marziano warned Mario Ferranti that Tocco had confessed their crime to him, and Mario responded by nodding his head affirmatively.

The government also produced evidence of Jack Ferranti's motive: to obtain an insurance award for an ailing business. Although he carried no insurance on his other store, Jack Ferranti renewed Today's Styles' fire policy, which had lapsed at the end of 1991, in the weeks immediately preceding the fire. He had informed investigators that his business was doing well, but evidence at trial—including a business diary and testimony of the store's employees—indicated that business had been extremely slow. Moreover, Ferranti had been unable to pay rent, which was scheduled to increase, on the store's five-year lease for the three months preceding the arson. Firefighters and insurance adjusters who inspected the building after the blaze discovered empty clothes racks with little debris beneath them, indicating that inventory had been removed from the store prior to the fire.

In addition to this circumstantial evidence, the government called as a witness Lisa Ziccardi, who testified that in the months prior to the fire, Jack Ferranti had told her that he would burn the heavily-insured store if business did not improve. Ziccardi had submitted a signed affidavit to investigators reporting Ferranti's statements and had similarly recounted his statements to an insurance company investigator. Yet, in the government's initial examination of her, she claimed a memory loss regarding Ferranti's statements, even when confronted with her own sworn, hand-written affidavit. Judge Weinstein subsequently held a hearing—outside the jury's presence—at which he concluded Ziccardi was feigning memory loss as the result of coercion by Ferranti. Because the defendant had effectively made her unavailable as a witness, the trial court ruled her sworn affidavit would be admissible as substantive evidence, under Fed.R.Evid. 803(5), if her feigned memory loss continued. When Ziccardi was recalled to the stand, she reluctantly stated that she remembered hearing Ferranti state his intention to set fire to the business. Because Ziccardi now recalled and testified to Ferranti's prior statements, Judge Weinstein denied the government's motion to introduce into evidence her sworn affidavit.

Jack Ferranti's defense consisted primarily of two experts who challenged the conclusion that the fire was intentionally set. First, Thomas Klem, a former employee of the National Fire Protection Association, testified that the fire could have been caused by an electrical short in the building since he had observed evidence of electrical arcing on the electrical outlet that was connected to the portable heater—evidence which he asserted had been subsequently altered. Second, Michael Higgins, who was called by the defense as a chemical expert, testified that the police reports did not conclusively establish that traces of a flammable accelerant were present in the materials taken from the store. But Higgins conceded that the large quantities of water used to extinguish a fire may wash away the chemical evidence of an accelerant.

The jury convicted Ferranti of arson homicide, arson conspiracy, 16 counts of mail fraud, and witness-tampering for his intimidation of Rodriguez prior to her grand jury testimony. The jury convicted his brother Mario Ferranti of arson conspiracy. Jack Ferranti moved unsuccessfully before the district court after trial to vacate his convictions on the grounds that the government's proof on the interstate commerce nexus to support the arson homicide charge was insufficient and that the mailings alleged in the indictment were too remote to constitute mail fraud.

After a lengthy restitution hearing, the district court sentenced Ferranti on the arson homicide conviction to 435 months in prison and five years of supervised release. On the remaining counts of conviction, that is, conspiracy to commit arson, mail fraud, and tampering with a witness, the district court imposed the statutory maximum sentences, with each to run concurrently with the arson homicide sentence. Judge Weinstein additionally ordered Ferranti to pay: (1) restitution in the amount of $1,455,799.79, pursuant to 18 U.S.C. § 3663; (2) a statutory

fine of $2,911,599.58 (twice the restitution amount), pursuant to 18 U.S.C. § 3571(d); (3) a $318,037.57 fine for the costs of imprisonment, pursuant to U.S.S.G. § 5E1.2(i) (with money to be deducted to cover support for Ferranti's former wife and child if such a need is properly certified); and (4) a total amount of $950 in special assessments ($50 for each of the 19 counts), pursuant to 18 U.S.C. § 3013(a)(2)(A).

Ferranti challenges his conviction and his sentence on numerous grounds, each of which we address in the following discussion. Although his brother Mario filed a notice of appeal, he subsequently moved to withdraw his appeal.

## ANALYSIS

### I Sufficiency of the Evidence

Ferranti challenges his arson homicide, mail fraud, and witness tampering convictions on the ground of insufficient evidence. A defendant challenging a conviction for insufficient evidence bears a heavy burden, *United States v. Russo,* 74 F.3d 1383, 1395 (2d Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 293, 136 L.Ed.2d 213 (1996), because we view the evidence in the light most favorable to the prosecution. *See United States v. Casamento,* 887 F.2d 1141, 1156 (2d Cir. 1989). We defer to the jury's resolution of witness credibility and, where there is conflicting testimony, to its selection between competing inferences. *See United States v. Pelaes,* 790 F.2d 254, 259 (2d Cir.1986). A conviction so challenged must be affirmed when we believe "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Desimone,* 119 F.3d 217, 223 (2d Cir.1997).

### A. *Arson Conviction*

■ Ferranti contends there is insufficient proof to support the interstate commerce element of the arson homicide offense. Citing *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), he urges that to support a conviction under the federal arson statute, 18 U.S.C. § 844(i), the government must establish the criminalized activity's substantial impact on interstate commerce.

In *Lopez,* the Supreme Court struck down the Gun–Free School Zones Act, 18 U.S.C. § 922(q)(1)(A), a statute criminalizing the knowing possession of a firearm in a school zone, on the ground that Congress exceeded its powers under the Commerce Clause when it enacted the statute. The Court found problematic the fact that the statute "neither regulate[d] a commercial activity nor contain[ed] a requirement that the possession be connected in any way to interstate commerce." *Id.* at 551, 115 S.Ct. at 1626. In particular, the Court emphasized that the Gun–Free School Zones Act "contain[ed] no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce." *Id.* at 561, 115 S.Ct. at 1631. Unlike the statute in *Lopez,* the federal arson statute does contain such a jurisdictional element, which provides that

> whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property *used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce* shall be imprisoned....

18 U.S.C. § 844(i) (emphasis added). In considering other federal criminal statutes containing jurisdictional elements, we have held that *Lopez* did not elevate the government's burden in proving a nexus to interstate commerce. *See United States v. Farrish,* 122 F.3d 146, 149 (2d Cir.1997) ("We find nothing in *Lopez* to suggest that the Court intended to heighten the threshold for establishing jurisdiction under such statutes."); *United States v. Leslie,* 103 F.3d 1093, 1100 (2d Cir.) (holding that *Lopez* did not raise the government's burden under the federal money laundering statute, 18 U.S.C. § 1956(a)(3)(B), which contains a jurisdictional element requiring the financial transaction to affect interstate or foreign commerce "in any way or degree"), *cert. denied,* —— U.S. ——, 117 S.Ct. 1713, 137 L.Ed.2d 837 (1997). We hold that in light of the fact that, unlike the

statute in *Lopez*, § 844(i) *does* contain a jurisdictional element, *Lopez* did not elevate the government's burden in establishing jurisdiction in a federal arson prosecution. *See United States v. Flaherty*, 76 F.3d 967, 974 (8th Cir.1996) ("The *Lopez* decision did not address the amount of evidence required to prove an explicit jurisdictional element of an offense and does not control this case."). Hence, to satisfy § 844(i) the government need only prove that the arson in question destroyed or damaged property either "used in" or "used in any activity affecting" interstate commerce.

■ Sufficient evidence to establish the interstate commerce nexus for the arson homicide offense was produced in this case. In *Russell v. United States*, 471 U.S. 858, 862, 105 S.Ct. 2455, 2457, 85 L.Ed.2d 829 (1985), the Court established a *per se* rule that, for purposes of § 844(i), rental property constitutes property that is used in an activity affecting interstate commerce. Inasmuch as § 844(i) contains a jurisdictional element, distinguishing it from the type of statute addressed in *Lopez*, we see no reason to conclude, as Ferranti apparently would have us do, that *Lopez* overruled the Court's holding in *Russell*. *See United States v. DiSanto*, 86 F.3d 1238, 1248 (1st Cir.1996) ("[W]e find no basis to conclude that *Lopez* in any way undercuts *Russell's* holding that rental property is unquestionably an activity that affects interstate commerce within the meaning of 18 U.S.C. § 844(i)."), *cert. denied,* — U.S. ——, 117 S.Ct. 1109, 137 L.Ed.2d 310 (1997). Under the jurisdictional standard outlined in § 844(i), the government offered enough proof to allow a rational jury to conclude that the building was rented for both commercial and residential purposes at the time of the arson, thereby conclusively establishing the requisite connection between the burned building and interstate commerce.

### B. *Mail Fraud Convictions*

The jury convicted appellant on 16 counts of mail fraud (counts 3 through 18 of the indictment) based on mailings he made in order to obtain money fraudulently from his insurance company. He challenges 15 of those 16 counts. While conceding that the mailing charged in count 14—the proof of loss form—was made in furtherance of the fraudulent scheme, he maintains that the mailings underlying the remaining counts are too remote to support conviction.

Underlying the discussion of these mail fraud convictions is the rule that a person who launches a fraudulent scheme through the use of the mails is criminally liable for all consequent mailings that occur. This rule is logical but severe—likened perhaps to the tyranny of inertia—which in this case ensnared defendant in further mail fraud counts beyond his initial mailing even though, for reasons of his own, he would have stopped if he could that which he had originally started.

■ A mail fraud conviction under 18 U.S.C. § 1341 requires proof that there was (1) a scheme to defraud (2) furthered by use of the mails (3) for the purpose of obtaining money or property. *United States v. Altman*, 48 F.3d 96, 101 (2d Cir.1995). Ferranti contests only the second prong. To meet prong (2) the government must show that the defendant caused the mailing and that it was in furtherance of a fraudulent scheme. *See United States v. Slevin*, 106 F.3d 1086, 1089 (2d Cir.1996).

■ We have construed § 1341's causation requirement liberally. *See, e.g., United States v. Bortnovsky*, 879 F.2d 30, 38–39 (2d Cir.1989). In order to show that the defendant "caused" the mailing, it need only be shown that he acted "with knowledge that the use of the mails will follow in the ordinary course of business," or that "such use can reasonably be foreseen, even though not actually intended." *Pereira v. United States*, 347 U.S. 1, 8–9, 74 S.Ct. 358, 362–63, 98 L.Ed. 435 (1954). Moreover, a mailing is in furtherance of a fraudulent scheme when it is "incident[al] to an essential part of the scheme," *see id.* at 8, 74 S.Ct. at 362, or "a step in [the] plot," *Badders v. United States*, 240 U.S. 391, 394, 36 S.Ct. 367, 368, 60 L.Ed. 706 (1916). A fact-specific inquiry must be made to determine intent, that is to say, "whether the mailing is part of the execution of the scheme as conceived by the perpetrator at the time." *Schmuck v. United States*, 489 U.S. 705, 711, 715, 109 S.Ct. 1443, 1448, 103 L.Ed.2d 734 (1989).

We have said, in general, that regardless of the identity of the sender, mailings sent in connection with an ordinary insurance claims process are related to an insurance fraud scheme. *See, e.g., Bortnovsky,* 879 F.2d at 39–41 (determining that a letter from insurance adjuster advising defendants to preserve their rights was in furtherance of fraudulent scheme). Conversely, a mailing that places the defrauded insurer on notice of the fraud, impedes the execution of the fraud, or discloses the nature of the fraud, may not be said to be in furtherance of a fraudulent scheme. *See United States v. Koen,* 982 F.2d 1101, 1107 (7th Cir.1992); *United States v. Pacheco–Ortiz,* 889 F.2d 301, 305 (1st Cir.1989); *United States v. Leyden,* 842 F.2d 1026, 1030 (8th Cir.1988).

We are persuaded here that the evidence supports Ferranti's conviction on all of the mail fraud counts. The use of the mails alleged in counts 3 through 18—correspondence regarding insurance reimbursement following an initial request—was clearly foreseeable. Further, that use was in furtherance of defendant's fraudulent scheme. To explain how the various mailings were in furtherance of Ferranti's fraudulent scheme, we divide them into the following five categories: (1) Requests for Information; (2) Letter of Representation; (3) Confirmation Letters; (4) Letter Acknowledging Receipt of Proof of Loss; (5) Letter Withdrawing the Insurance Claim.

■ (1) *Requests for Information: Counts 3, 4, 5, 6, 16 and 17.* The mailings in counts 3 and 5 were letters sent to Ferranti on behalf of the insurer requesting information regarding the store's financial situation, Ferranti's alibi, and the names of employees who might assist in the investigation of the fire. Counts 4 and 6 related to letters sent to defendant on behalf of the insurer requesting him to file a sworn statement in proof of loss and attend a deposition. Similarly, the count 16 mailing was another request for information made to Ferranti's attorney on behalf of the insurer. Count 17 concerned a mailing sent to defendant's former employee on behalf of the insurer requesting the deposition of that employee.

Mailings related to an insurance investigation that are a part of the customary steps taken by an insurance carrier to decide whether to pay a claim under a policy, and not for the purpose of defeating the claim, are in furtherance of the fraudulent scheme under § 1341. *Koen,* 982 F.2d at 1109–10; *see also United States v. McClelland,* 868 F.2d 704, 708–09 (5th Cir.1989); *cf. United States v. Castile,* 795 F.2d 1273, 1280 (6th Cir.1986) (letter rejecting proof of loss and denying claim not in furtherance of scheme). A rational jury could conclude that these mailings involved routine requests for information needed to advance the insurer's normal claim processing and therefore furthered the scheme.

Alternatively, Ferranti attacks his convictions on counts 4 and 6 as being cumulative, since both mailings requested essentially the same information from Ferranti and the letter charged in count 6 was mailed to Ferranti at a new address only after the letter charged in count 4 was returned to the sender. A factfinder could reasonably find that the original letter of count 4 was properly sent to Ferranti, but that Ferranti refused to accept it, thereby precipitating the need to mail the second letter that formed the basis for count 6. As a result, both letters would be in furtherance of the fraudulent scheme.

■ (2) *Letter of Representation: Count 13.* Count 13 concerned a mailing by Ferranti's attorney to the insurance company informing the insurer of his representation of Ferranti. This letter was made in furtherance of the fraudulent scheme because it served to facilitate correspondence during the course of the insurance claim process.

■ (3) *Confirmation Letters: Counts 7, 8 and 9 and 10, 11 and 12.* These six mail fraud counts are predicated on the mailing of three copies each of two letters. Counts 7 through 9 were based on a letter mailed on behalf of the insurer confirming the oral rescheduling of Ferranti's deposition. A copy of this letter was sent to Ferranti's two known addresses as well as to Ferranti's public adjuster representative, Henry Gritz. Counts 10 through 12 were based on a letter mailed on behalf of the insurer confirming the oral re-rescheduling of Ferranti's deposi-

tion. Again, two copies were sent to Ferranti, and one copy was sent to representative Gritz.

Ferranti attacks his convictions under these counts on two grounds. First, he characterizes these mailings as mere confirmations of prior oral statements that therefore cannot be considered as being in furtherance of the fraudulent scheme. On the contrary, these confirmations were part of the routine insurance claims process that furthered the collection scheme by informing Ferranti of his scheduled deposition. *See McClelland,* 868 F.2d at 707–08 (reasoning that a confirmation of an oral statement made during a routine insurance claims process could provide a basis for a mail fraud conviction). A rational jury could find that the confirmation letter was sent to reschedule Ferranti's deposition so that his claim could be processed. This is especially true given the fact that the initial oral communications rescheduling Ferranti's deposition did not directly involve Ferranti.

As an alternative challenge, Ferranti contends that even if the letters can serve as the basis for mail fraud convictions, each of the two letters supports only one conviction. However, separate mailings of the same document may support separate convictions under § 1341 when each is a necessary and reasonable step in the claim process. *United States v. Draiman,* 784 F.2d 248, 253 (7th Cir.1986). As a result of Ferranti's complaint that he had not received an earlier mailing from the insurance company (i.e., the prior mailing involved in count 4), the insurer mailed a copy of each confirmation to Ferranti's representative and to Ferranti's two known addresses to ensure that Ferranti would receive each confirmation. Our reading of the record persuades us that a reasonable jury could believe that these mailings in triplicate were part of routine claim processing and thus furthered his scheme.

■ (4) *Letter Acknowledging Receipt of Proof of Loss: Count 15.* Count 15 concerns a letter to Ferranti's attorney on behalf of the insurer acknowledging the receipt of the proof of loss forms. These acknowledgement forms were also part of routine insurance claim processing.

■ (5) *Letter Withdrawing the Insurance Claim: Count 18.* Finally, Ferranti's challenge to his conviction on count 18 gives us pause. This conviction was based on a letter written by Ferranti's attorney withdrawing his insurance claim in an effort to cover-up his unsuccessful scheme. The government urges that because withdrawal was essential for the successful cover-up of the unsuccessful scheme, this mailing was in furtherance of the scheme. We agree that a mailing is in furtherance of a scheme when "designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place." *United States v. Lane,* 474 U.S. 438, 451–52, 106 S.Ct. 725, 733–34, 88 L.Ed.2d 814 (1986) (quoting *United States v. Maze,* 414 U.S. 395, 403, 94 S.Ct. 645, 650, 38 L.Ed.2d 603 (1974)). Although in the case at hand, Ferranti's withdrawal letter ended his unsuccessful scheme to obtain insurance proceeds fraudulently, the attempt at concealment was directed at avoiding—or perhaps, more accurately, limiting—criminal liability. A factfinder could reasonably conclude that the withdrawal letter was designed to make the company feel secure that this fireloss claim was no longer being advanced and defer any complaint to the authorities about the defendant that their investigation of the fire had uncovered, thus making his apprehension less likely. Consequently, this conviction must also be affirmed.

## C. *Witness–Tampering Conviction*

■ Ferranti challenges his witness-tampering conviction on the ground that there was insufficient evidence to establish that he attempted to persuade witness Rodriguez, a store employee, to lie before the grand jury. An individual tampers with a witness in violation of 18 U.S.C. § 1512(b) when he "knowingly uses intimidation or physical force, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to . . . influence, delay, or prevent the testimony of any person in an official proceeding."

Although appellant admits that on the day after the fire he instructed Ms. Rodriguez to tell the police that there had been a heater in the store, he says there is no proof of any intimidation by him specifically directed at her grand jury testimony. He contends that because Rodriguez reported no pressure from him in the 15 months that elapsed from the time of the fire until her grand jury testimony, no rational jury could find him guilty of witness tampering. Ferranti's marshalling of the evidence, however, does not meet the heavy burden imposed on a defendant challenging a conviction based on an insufficiency of the evidence.

Circumstantial evidence was proffered from which the jury could infer that appellant corruptly attempted to influence Rodriguez' testimony before the grand jury. Rodriguez, who was a tenant in one of Ferranti's buildings, was also his employee at the Today's Styles store. The jury could reasonably have believed that as her landlord and her employer, he had a strong influence over her. Although Rodriguez testified at trial that she alone retained her attorney on the advice of her sister-in-law after receiving the grand jury subpoena, there was proof that her sister-in-law was also a Ferranti employee, that Rodriguez' financial resources were insufficient to cover the $500 cash payment made to the attorney at their initial meeting, and that Ferranti accompanied her to the attorney's office for that meeting. From this, the jury could reasonably infer that after Rodriguez received a grand jury subpoena, appellant secured and paid for an attorney for her. Further, when Rodriguez testified at Ferranti's criminal trial, the jury had an opportunity to observe her demeanor in appellant's presence. In short, Ferranti's § 1512(b) conviction for witness tampering is amply supported by the record.

## II  Evidentiary Rulings

Ferranti contends that Marziano's testimony recounting Tocco's confession of his and Mario Ferranti's involvement in the fire was inadmissible hearsay admitted in violation of the Confrontation Clause. He also avers that Tocco's statement regarding Mario Ferranti's affirmative nod in response to Marziano's account of what Tocco had said was improperly admitted as an adoptive admission under Fed.R.Evid. 801(d)(2)(B). In addition, appellant takes issue with the district court's determination that, in light of Ziccardi's functional unavailability as a witness, her prior sworn statements before the grand jury were admissible. We consider each evidentiary issue in turn.

### A.  Tocco's Statement to Marziano

■ At trial, Marziano testified that Tocco came to his house at 2 a.m., within three hours after the fire began, and confessed that he and Mario Ferranti had set fire to a Queens building for Mario's brother Jack. The government suggested three different theories under which this statement could be admitted: (1) as a declaration against Tocco's penal interest under Fed.R.Evid. 804(b)(3); (2) as an excited utterance under Fed. R.Evid. 803(2); and (3) as an inherently reliable statement under Fed.R.Evid. 804(b)(5)'s residual exception to the hearsay rule. Appellant asserts that none of these theories is valid and that the district court erred in allowing Marziano to testify with respect to the statement.

■ Admissibility determinations are reviewed under an abuse of discretion standard. *United States v. DeVillio*, 983 F.2d 1185, 1189 (2d Cir.1993). Because we are of the view that it was not an abuse of the trial court's discretion to admit the statement as an excited utterance exception to the hearsay rule, we do not address the remaining theories of admissibility.

■ An excited utterance is a statement "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Fed.R.Evid. 803(2). The rationale for this hearsay exception is that the excitement of the event limits the declarant's capacity to fabricate a statement and thereby offers some guarantee of its reliability. An excited utterance need not be contemporaneous with the startling event to be admissible under Rule 803(2). *See, e.g., United States v. Scarpa*, 913 F.2d 993, 1017 (2d Cir.1990) (five or six hours between beating and statement).

Judge Weinstein believed Tocco's statement to Marziano qualified as an excited utterance. The record amply supports this finding. The fire itself may constitute a startling event, but even if it did not, certainly Tocco's subsequent realization that people could be trapped inside the burning building, which he had helped set, would comprise a startling event. This knowledge was imparted to Tocco at 11:00 p.m., when the Anthonys told him that some people had remained in the burning building. Within three hours of this discovery, Tocco arrived at Marziano's residence, knocking on Marziano's window and exclaiming, "Mario and I lit a building for Jack." Tocco's excitement obviously had not subsided at that time. During his testimony, Marziano described Tocco's demeanor that morning as "all hyped" and "nervous." Under these circumstances, Tocco's statement was properly received as an excited utterance under Fed.R.Evid. 803(2).

■ Appellant also challenges the portion of the statement implicating himself (i.e., the "for Jack" portion) as being improperly admitted because the prosecutor had failed to prove that Tocco had personal knowledge that he and Mario Ferranti had set the fire for defendant. The applicable rule of evidence, Fed.R.Evid. 602, states, in relevant part, that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." The test is "whether a reasonable trier of fact could believe the witness had personal knowledge." *Folio Impressions, Inc. v. Byer California,* 937 F.2d 759, 764 (2d Cir.1991). The record shows that while neither Tocco nor Mario Ferranti had an ownership interest in the Queens clothing store, a key was used to enter the store on the night of the arson. A trier of fact could reasonably believe that Tocco obtained the key from the store owner and therefore was aware that the arson was committed at the owner's direction. Further, witnesses testified that when Ferranti required help with his properties, he typically solicited his brother Mario who, in turn, recruited his friends. A factfinder could have reasonably decided, based upon this evidence, that Tocco had personal knowledge

that he and Mario Ferranti had set the fire for the defendant, Jack Ferranti.

■ Even though Tocco's entire statement is admissible under the Federal Rules of Evidence, appellant declares that its admission violated his constitutional rights under the Confrontation Clause. This argument is without merit. The Supreme Court teaches that the Confrontation Clause and the hearsay rules are both "generally designed to protect similar values." *Bourjaily v. United States,* 483 U.S. 171, 182–83, 107 S.Ct. 2775, 2782–83, 97 L.Ed.2d 144 (1987). As a result, certain "firmly rooted" hearsay exceptions, ones that carry sufficient indicia of reliability and trustworthiness, will inevitably satisfy the Confrontation Clause. *White v. Illinois,* 502 U.S. 346, 356, 112 S.Ct. 736, 743, 116 L.Ed.2d 848 (1992). An excited utterance is one such firmly established exception that escapes independent Confrontation Clause analysis. *Id.* at 357, 112 S.Ct. at 743. Although the Supreme Court refers to "spontaneous declarations" throughout its opinion in *White v. Illinois,* it is clear the Court is discussing excited utterances, which do not require absolute contemporaneity with the event described. We say that because the Court directly refers to Fed.R.Evid. 803(2), the excited utterance exception, *id.* at 355 n. 8, 112 S.Ct. at 743 n. 8, and also refers to a statement "offered in a moment of excitement," *id.* at 356, 112 S.Ct. at 743. As a result, appellant's Confrontation Clause challenge lacks merit because Tocco's statement is admissible as an "excited utterance."

### B. Testimony About Mario's Nod

■ Ferranti next challenges the trial court's decision to allow Marziano to testify as to Mario's nod in response to Marziano's account of Tocco's admission. Ferranti thinks this was error because the nod was ambiguous. This evidentiary ruling is reviewed for abuse of discretion. *United States v. Aponte,* 31 F.3d 86, 87 (2d Cir.1994).

An innocent person accused of being involved in a crime will ordinarily deny such involvement or, at least, assert that the incriminatory statement is untrue. *United States v. Shulman,* 624 F.2d 384, 390 (2d Cir.1980). Absent circumstances that render

it more probable that a person would not respond to an accusation against him than that he would, such person's silence or other ambiguous conduct is admissible as an adoptive admission under Fed.R.Evid. 801(d)(2)(B). *United States v. Flecha*, 539 F.2d 874, 877 (2d Cir.1976). Marziano testified that he cautioned defendant's brother, while the two of them were alone in an alley behind a bar, that Tocco was talking about their involvement in the arson. This is exactly the type of statement that an innocent person, under these circumstances, would normally deny. *See, e.g., United States v. Williams*, 577 F.2d 188, 194 (2d Cir.1978) (reasoning that where defendant did not "vigorously assert[ ]" his non-involvement in a conspiracy, his statements could constitute an adoptive admission). But Mario Ferranti nodded his head affirmatively in response to the warning. Thus, the court's ruling that Mario's nod constituted an adoptive admission about which Marziano could testify was not an abuse of its discretion.

The so-called ambiguity surrounding the meaning of Mario Ferranti's nod does not undermine the district court's admissibility determination. This evidentiary determination was preliminary to a decision as to what inference should be drawn from it, which was ultimately a question for the jury to assess, rather than for an appellate court. *See* Fed. R.Evid. 104(b); *see also* 8 Weinstein's Federal Evidence § 801.21[3] (2d ed.1997).

### C.  *Admissibility of Lisa Ziccardi's Prior Statements*

Another evidentiary decision which has come under attack is the decision to admit Lisa Ziccardi's prior sworn affidavit in which she stated that Ferranti told her he intended to burn down his store for insurance money. When Ziccardi was initially called to testify at defendant's trial, she stated she was unable to recall Ferranti's prior statements even when shown her own affidavit. After a hearing outside the jury's presence, Judge Weinstein ruled that Ferranti had effectively procured the absence of a witness, and held that the affidavit would be admissible if she continued to feign memory loss. *See United States v. Mastrangelo*, 693 F.2d 269, 272 (2d

Cir.1982) (reasoning that where, after an evidentiary hearing, the district court finds that defendant procured the absence of a witness, that witness' out-of-court statements are admissible on the ground that defendant waived his Sixth Amendment right to confront the witness by his misconduct). Appellant contends Ziccardi's refusal to confirm her prior statements did not constitute absence within the meaning of *Mastrangelo*, and therefore it was error to rule the affidavit admissible. We need not address this issue because the affidavit was never admitted into evidence against appellant since after the court's ruling, Ziccardi returned to the witness stand and reluctantly testified to Ferranti's statements. As a result, the court thereafter denied the government's motion to introduce her sworn affidavit as substantive evidence.

## III   Deprivation of Fair Trial Claim

Ferranti next asserts that he was denied a fair trial as a result of prosecutorial misconduct, in combination with the trial judge's treatment of Ziccardi discussed above, that conveyed his disbelief of the defense's case.

### A.  *The District Court's Treatment of Ziccardi*

We see no prejudice to appellant in the district court's actions vis-à-vis witness Ziccardi. The admissibility ruling was made outside the jury's presence and therefore could not have conveyed any message of Judge Weinstein's alleged disbelief to the jury. With respect to the court's questioning of Ziccardi, it is settled law that a trial judge may actively participate in questioning to clarify ambiguities, correct misstatements, or obtain information necessary to make rulings. When a judge's conduct is challenged as displaying bias against the defendant, the entire record must be examined to determine whether the jurors have been so impressed by the judge's partiality that it affected their deliberations. *See United States v. Filani*, 74 F.3d 378, 385–86 (2d Cir.1996). Our review of the record as a whole satisfies us that Judge Weinstein's participation did not demonstrate bias or deny Ferranti a fair trial.

### B. *Alleged Prosecutorial Misconduct*

We·next address Ferranti's allegations of prosecutorial misconduct during the government's examination of Marziano and during its rebuttal summation. In order to prevail on such a claim a defendant must demonstrate that the prosecutor's inappropriate comments caused "substantial prejudice." *United States v. Bautista,* 23 F.3d 726, 732 (2d Cir.1994). To determine whether substantial prejudice exists, we weigh the severity of the alleged misconduct, the measures adopted to cure it, and the certainty of conviction absent the misconduct. *See Russo,* 74 F.3d at 1396.

Ferranti declares first that the prosecutor made an improper reference to other evidence during the government's examination of Marziano. Specifically, the prosecutor asked Marziano whether he was "aware" that the government had "a lot of other evidence" and could "figure out whether or not [Marziano] was being accurate." The comments embodied in this question were arguably improper, but we think no substantial prejudice resulted. The jury was promptly given curative instructions to disregard the statement and told repeatedly that it should only consider the evidence presented at the trial. Further, there was ample evidence, absent this comment, to support appellant's convictions.

The remaining claim of prosecutorial misconduct centers on the government's rebuttal summation. Appellant alleges the prosecutor placed his own credibility at issue, argued facts not in evidence, accused the defense of slandering the victims, vouched for a government witness, and made inflammatory comments about defense counsel and a defense expert witness. The prosecution and the defense are generally entitled to wide latitude during closing arguments, so long as they do not misstate the evidence. *United States v. Myerson,* 18 F.3d 153, 163 (2d Cir.1994). Under the invited or fair response doctrine, the defense summation may open the door to an otherwise inadmissible prosecution rebuttal. *See United States v. Robinson,* 485 U.S. 25, 32, 108 S.Ct. 864, 869, 99 L.Ed.2d 23 (1988). In particular, where the defense summation makes arguments and allegations against the government, the prosecutor may respond to them in rebuttal. *See United States v. Rivera,* 971 F.2d 876, 883 (2d Cir.1992); *United States v. Bagaric,* 706 F.2d 42, 60 (2d Cir.1983). We review the allegedly improper prosecutorial statements during summation in the context of the entire argument before the jury to determine whether the defendant was deprived of a fair trial. *United States v. Pena,* 793 F.2d 486, 490 (2d Cir.1986).

Each of the challenged statements in the prosecution's rebuttal were fair responses to the defense summation. Defendant cannot now complain about the issues raised and the atmosphere created by his own making through the defense summation. To the extent that any of the comments could be labelled improper, none were so egregious as to infect the proceedings in such a manner as to deprive defendant of due process of the law. *See Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986).

### IV   Challenges to the Sentence

#### A. *Applicable Guideline for Arson Homicide*

Ferranti was sentenced to 435 months in prison and ordered to pay restitution and a hefty fine. His first challenge to his sentence is the district court's use of U.S.S.G. § 2A1.1 as its basis. Guidelines § 2K1.4 governs sentencing for arson homicide. When arson results in death, "or the offense was intended to cause death or serious bodily injury," § 2K1.4(c)(1) directs the sentencing court to apply the guideline listed in Chapter Two, Part A, the section of the Guidelines dealing with homicide, that is most analogous to the arson offense. Appellant urges that since in this case the fireman's death was unknowingly and unintentionally caused, the sentencing court erred in relying on § 2A1.1, the first-degree murder guideline, as the basis for his sentence on the arson conviction.

This contention is without merit. Section 2A1.1 applies to any death which "results from the commission of certain felonies." *See* U.S.S.G. § 2A1.1, comment. (n.1). The

application notes identify the federal felony murder statute, 18 U.S.C. § 1111, as suggestive of which felonies are included. That statute defines first-degree murder as a killing "committed in the perpetration of, or attempt to perpetrate, any arson...." 18 U.S.C. § 1111(a). Hence, since death resulted from arson, the Guidelines authorize the sentencing court to apply the guideline for first-degree murder based upon that court's assessment of the facts surrounding the arson homicide. Contrary to defendant's suggestion, this discretion in imposing sentence does not create an impermissible ambiguity in the Guidelines requiring application of the rule of lenity. *Cf. United States v. Canales,* 91 F.3d 363, 367 (2d Cir.1996) ("The rule of lenity requires the sentencing court to impose the lesser of two penalties where there is an actual ambiguity over which penalty should apply.").

■ Ferranti continues the challenge to his sentence by arguing that, even if § 2A1.1 is applicable, the district court should have departed downward based on the facts of this case. Under § 2A1.1, a sentencing court is free to depart downward "[i]f the defendant did not cause the death intentionally or knowingly." U.S.S.G. § 2A1.1, comment. (n.1). In the absence of an error of law or an erroneous belief on the part of the sentencing court that it had no power to depart, the district court's refusal to grant a downward departure and the extent of its departure are not appealable. *See United States v. Hendron,* 43 F.3d 24, 26 (2d Cir.1994) (per curiam).

■ In light of this standard, defendant attacks the district court's failure to downwardly depart under § 2A1.1 as an error of law on the ground that he did not "knowingly or intentionally" cause the firefighter's death. Yet, a plain reading of § 2A1.1's commentary refutes this claim. It says that "a downward departure *may be* warranted" if the defendant did not intend to cause death. U.S.S.G. § 2A1.1, comment. (n.1) (emphasis added). The sentencing court was well aware of its *discretionary* power to depart under § 2A1.1, but chose not to do so after specifically identifying several aggravating factors, *e.g.,* Ferranti's scheme to defraud an insur-

ance carrier, his knowledge of tenants' presence in the building, the use of an accelerant, and his decision to set a building that was in part residential afire at night. In sum, we have no basis for reversing the district court's decision not to depart downwardly under § 2A1.1.

### B. *The Jury Directive Requirement*

■ The district court did depart downwardly (from a life sentence), but it did so in order to avoid complying with 18 U.S.C. § 34's requirement that a jury approve of the life sentence mandated by § 2A1.1's base level offense of 43. The applicable version of § 34 provides:

> Whoever is convicted of any crime prohibited by this chapter, which has resulted in the death of any person, shall be subject also to the death penalty or to imprisonment for life, if the jury shall in its discretion so direct, or, in the case of a plea of guilty, or a plea of not guilty where the defendant has waived a trial by jury, if the court in its discretion shall so order.

18 U.S.C. § 34 (1988), *amended by* 18 U.S.C. § 34 (1994). The plain language of this section authorizes the imposition of a life sentence only by jury recommendation in the absence of a plea. Such a recommendation was never requested of the jury in this case.

Instead, the district court departed downward to base offense level 42, which provides for a term of imprisonment from 360 months to life under the appropriate criminal history category. In its calculation of Ferranti's sentence, the court determined that the 43-year old Ferranti's life expectancy was 31 years, or 372 months, from the time of sentencing. After considering the total amount of good-time credit to which he would be entitled, *see* 18 U.S.C. § 3624(b) (1994) (effective Nov. 1, 1987) (allowing 54 days of good-time credit per year), Judge Weinstein sentenced Ferranti to 435 months—5 years *more* than his life expectancy. With 64.3 months of good-time credit considered, Judge Weinstein determined that Ferranti's actual term of imprisonment would be 371 months from the time of his arrest, a period of time one month short of his life expectancy.

Appellant insists that his 435–month sentence violates § 34 because it exceeds his life expectancy, despite the fact that the sentence that he is likely to serve after receiving good-time credits is less than his life expectancy. The question before us is whether the maximum good-time credits should be deducted from a formal sentence in determining whether that sentence complies with § 34. Ferranti's only argument against consideration of the good-time credits is that he is not yet entitled to them and therefore is not guaranteed release after a term of imprisonment less than his life expectancy.

While it is true that a defendant is not entitled to such credit, *see* 18 U.S.C. § 3624(b) (a prisoner "may receive" good-time credit subject to the Bureau of Prisons' determination that he has displayed "exemplary compliance with such institutional disciplinary regulations"), we decline to adopt Ferranti's interpretation of § 34 that would, in effect, allow defendants to argue that they should receive a shorter formal sentence because they plan to disregard prison rules and thus fail to earn good-time credit. In holding that the district court does not violate § 34 when it considers maximum good-time credit in its calculation of a defendant's sentence, we join another circuit that has already done so. *See United States v. Gullett,* 75 F.3d 941, 951 (4th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 134, 136 L.Ed.2d 83 (1996); *see also United States v. Prevatte,* 66 F.3d 840, 848 (7th Cir.1995) (Posner, C.J., concurring) ("I do think the maximum good-time credits should be subtracted. The defendant should not be allowed to say, 'My sentence is too long because I am planning to be a bad boy in prison and so won't earn the maximum good-time credits.' ").

■ We also reject Ferranti's additional contention that, even considering the good-time credits, a 371–month term of imprisonment violates § 34 by falling uncomfortably close to his life expectancy. A sentence that is close to a person's life expectancy based on actuarial tables is not the functional equivalent of a sentence for the actual life of the person.

■ Although the jury directive requirement was eliminated in 1994, *see* Violent Crime Control and Law Enforcement Act of 1994, Pub.L. No. 103–322, Title VI § 60003(a)(1), 108 Stat. 1968 (1994), the *Ex Post Facto* Clause precludes application of the 1994 amendment since Ferranti committed the arson in 1992 and, under the *Ex Post Facto* Clause, a retroactive change in the definition of a crime or a retroactive increase in punishment for a criminal act is forbidden. *See Collins v. Youngblood,* 497 U.S. 37, 43, 110 S.Ct. 2715, 2719–20, 111 L.Ed.2d 30 (1990).

## C. *The Fine*

■ The statutory fine of $2,911,599.58 for the arson homicide count is raised as an issue on the grounds that it is overly punitive and based upon improper considerations. The sentencing court departed upwardly from the Sentencing Guidelines' range of $25,000 to $250,000, *see* U.S.S.G. § 5E1.2(c), and, relying on 18 U.S.C. § 3571(b)(2), imposed a statutory fine equal to twice the amount of the victims' losses.

■ Section 3571(b)(2) cross-references § 3571(d), which states that "if the offense results in a pecuniary loss to a person other than the defendant, the defendant may be fined not more than the greater of ... twice the gross loss, unless imposition of a fine under this subsection would unduly complicate or prolong the sentencing process." We review the district court's decision to depart upwardly under an abuse of discretion standard. *See United States v. Wilder,* 15 F.3d 1292, 1300 (5th Cir.1994) (abuse of discretion standard applied to appellate review of enhanced fine imposed under § 3571(d)); *cf. United States v. Lavin,* 27 F.3d 40, 42 (2d Cir.1994) (per curiam) (order of restitution reviewed for abuse of discretion).

■ Defendant's basic point is that the amount of the fine is grossly punitive in light of his financial resources. Under 18 U.S.C. § 3572(a), a sentencing court must consider a number of factors, some pertaining to defendant, some to other concerns. Among those factors are: (1) the defendant's income, earning capacity and financial resources; (2) the burden the fine imposes on the defendant and his financial dependents; (3) pecuniary

loss inflicted upon others; (4) whether restitution is ordered; (5) the expected costs of imprisonment; and (6) whether defendant can pass along the costs of the fine to consumers or other persons. There is no requirement that explicit findings be made concerning the defendant's ability to pay the fine, *cf. Lavin,* 27 F.3d at 42 (no explicit findings needed to support imposition of restitution order), and defendant bears the burden of establishing his inability to pay. *See United States v. Marquez,* 941 F.2d 60, 65–66 (2d Cir.1991).

The record shows that the district court considered the mandatory factors, including Ferranti's known assets and the possible financial dependence of his son and former wife. It also considered defendant's failure to file tax returns over the past 10 years and his refusal to disclose financial information during pre-sentencing proceedings. From this evidence it inferred that appellant possessed considerably more assets than he admitted, and therefore that he had the financial resources to pay the large fine imposed. This inference was reasonable because defendant failed to establish his inability to pay. Moreover, we cannot allow a defendant's lack of disclosure at the sentencing phase of the criminal proceedings against him to work to his advantage on an appeal from that sentence.

Ferranti also maintains that the district court's consideration of allegations of appellant's other criminal conduct was improper. Evidence of such conduct was offered at a pre-trial bail proceeding and noted in the pre-sentence report. However, the district court struck all references to such conduct from the report prior to sentencing. There is no evidence in the record from which we could conclude that, after striking the allegations, the district court impermissibly based imposition of the fine on that alleged criminal conduct. To the contrary, Judge Weinstein clarified that Ferranti's offense for which he was convicted and not his status as a slumlord or his unrelated violent conduct warranted the large fine.

In sum, the fine was reasonable and sufficiently supported by a record that fully demonstrates the exacerbated nature of the crime, the harm inflicted upon others, the defendant's ability to pay, and the lack of persons financially dependent upon defendant. *See* 18 U.S.C. § 3572(a) (setting forth factors that must be considered when imposing a fine).

## CONCLUSION

Having considered all of Ferranti's challenges and finding no basis for reversal, the judgment of conviction with the sentence of conviction is accordingly affirmed.